# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 12

### OCTOBER TERM, A.D. 2014

### January 21, 2015

WILLIAM S. HANSULD and TIA J.
HANSULD,

Appellants
(Plaintiffs),

v.                                                    S-14-0128

LARIAT DIESEL CORPORATION and
MARVIN PIEL,

Appellees
(Defendants).

*Appeal from the District Court of Natrona County*
The Honorable Catherine E. Wilking, Judge

*Representing Appellants:*
    Larry W. Harrington of the Harrington Law Firm, P.C., Casper, Wyoming.

*Representing Appellees:*
    Thomas M. Hogan, Casper, Wyoming.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]     The district court determined the location of an implied access easement for Lariat Diesel Corporation and Marvin Piel (hereinafter referred to collectively as "Lariat") across property belonging to William S. and Tia J. Hansuld.  The Hansulds assert the district court applied the wrong rule of law in determining the location of the easement and its decision was not supported by the evidence presented at trial.  While we agree that the district court's legal analysis was incorrect in some respects, we conclude that its ultimate decision was correct and affirm.

## ISSUES

[¶2]     The issues we must address in this appeal are:

　　　1.　　　Did the district court err by refusing to rule that Lariat did not prove the elements of an implied easement and, therefore, was not entitled to an easement at all?

　　　2.　　　Did the district court apply the wrong rule of law to locate the easement?

　　　3.　　　Was the district court's decision as to the location of Lariat's implied easement unsupported by the record or erroneous as a matter of law?

## FACTS

[¶3]     The properties at issue in this case are commercial properties that were, at one time, commonly owned by Chapin and Ratcliff, LLC (the LLC).  Lariat purchased part of the property in 1995 when it took over a diesel truck sales and service business that had been operating on the property.  The truck business had historically used the adjoining property for access, and the LLC and Lariat agreed that the arrangement should continue. *Hansuld v. Lariat Diesel Corp.,* 2003 WY 165, ¶¶ 4-6, 81 P.3d 215, 217 (Wyo. 2003) (*Hansuld I*).

[¶4]     In 1996, the LLC sold the property adjacent to Lariat's to Gary Petley.  Prior to the closing on that transaction, the LLC, Lariat and Mr. Petley met to discuss exchanging easements, specifically an access easement for Lariat across Petley's property and a sewer easement for Petley across Lariat's property. *Hansuld I,* ¶¶ 6-7, 81 P.3d at 217. The LLC signed the Access Agreement in favor of Lariat, and Lariat signed a sewer easement.  The Access Agreement granted Lariat an easement over the southerly 100 feet of Petley's property.  Unfortunately, the Access Agreement was not recorded until after the warranty deed from the LLC to Petley so the agreement was outside the chain of title. *Id.,* ¶ 8, 81 P.3d at 217.  Nevertheless, Lariat continued to use the adjoining property for access and, although the property had different owners over the years, there were no problems until the Hansulds acquired it in 2001.

1

[¶5]     The Hansulds' predecessors operated businesses involving the sale of various types of vehicles.  Similarly, the Hansulds operate a low volume used car business and an electrical contractor business on their property.  Immediately after purchasing it, the Hansulds notified Lariat that it could no longer use their property for access and constructed a fence along the property line.  The conflicts between the parties grew and litigation ensued.  *Hansuld I,* ¶ 10, 81 P.3d at 217.

[¶6]     The present matter is the third appeal of the parties' various claims to this Court.  In *Hansuld I,* we ruled that Lariat had an implied easement for access across the Hansulds' property, including a portion that had been part of the highway right-of-way and abandoned to the adjacent property owners in 2001.  In *Hansuld v. Lariat Diesel Corp.,* 2010 WY 160, 245 P.3d 293 (Wyo. 2010) (*Hansuld II)*, we ruled, among other things, that Lariat was entitled to a judicial determination as to the specific location of its implied access easement, and remanded for appropriate proceedings.

[¶7]     On remand, the district court conducted a bench trial to establish the location of the easement.[1]  The court had before it a set of stipulated documents which included the original ineffective Access Agreement.  In addition, the parties presented lay and expert testimony concerning the path of trucks traversing the Hansulds' property to enter or exit Lariat's diesel truck business.  The district court applied the law of floating easements to determine the location of Lariat's implied access easement and accepted one of Lariat's proposed locations with some modification.  After the district court entered judgment, the Hansulds appealed.

## STANDARD OF REVIEW

[¶8]     We apply the following standard to review a district court's decision after a bench trial:

> "The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the

---

[1] The district court also ruled on several other items presented by the parties, including location of an implied water line easement, competing claims for parking lot and sewer maintenance, and various requests for damages and injunctive relief.  The only ruling challenged on appeal is the district court's location of Lariat's access easement.

2

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

With regard to the trial court's findings of fact,

"we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law."

The district court's conclusions of law, however, are subject to our *de novo* standard of review.

*Morris v. CMS Oil & Gas Co.,* 2010 WY 37, ¶ 12, 227 P.3d 325, 330 (Wyo. 2010), quoting, *Lieberman v. Mossbrook,* 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo. 2009) (citations omitted). *See also Windsor Energy Group, LLC v. Noble Energy, Inc.,* 2014 WY 96, ¶ 9, 330 P.3d 285, 288 (Wyo. 2014).

## DISCUSSION

### 1. Existence of Implied Easement

[¶9]    The Hansulds argue that Lariat did not meet its burden of proving that an implied easement existed at all.  As we stated in our prior *Hansuld* decisions:

The elements which must be satisfied in order to establish an implied easement are: (1) common ownership followed by a conveyance separating the unified ownership; (2) before severance, the common owner used part of the property for the benefit of the other part, a use that was apparent, obvious, and continuous; and (3) the claimed easement is necessary and beneficial to the enjoyment of the parcel previously benefitted.

*Hansuld I,* ¶ 15, 81 P.3d at 218 (citations omitted).  The Hansulds maintain that Lariat did not prove the second and third elements of implied easements.

[¶10] The existence of an implied easement in favor of Lariat over the Hansulds' property has been extensively litigated.  In *Hansuld I,* we affirmed the district court's determination that Lariat was entitled to an implied easement, and in *Hansuld II* we ruled

3

that Lariat was entitled to a judicial determination of the exact location of the implied easement.

[¶11]  The law of the case doctrine states that a court's final decision at one stage of a proceeding is binding in the successive stages of litigation. *Lieberman* , ¶ 28, 208 P.3d at 1305.  "Ordinarily, the law of the case doctrine requires a trial court to adhere to its own prior rulings, the rulings of an appellate court, or another judge's rulings in the case or a closely related case." *Id.*, citing *Triton Coal Co. v. Husman, Inc.,* 846 P.2d 664, 667–68 (Wyo. 1993).  Given the history of the case at bar, the law of the case is that an implied easement exists, and we expressly decline the Hansulds' request to reconsider the merits of that question.

### 2.  Legal Standard

[¶12]  The Hansulds claim the district court applied the wrong legal standard when it located Lariat's access easement.  In particular, the Hansulds take issue with the district court's reference to "floating easements," believing the district court wrongly applied the principles relevant to express easements rather than implied easements.  The district court's decision letter stated:

> In accordance with the Wyoming Supreme Court's decision in *Hansuld II,* ¶ 23, 245 P.3d at 301, Lariat requests a declaratory judgment legally describing its implied access easement across the Hansulds' property.  Because Lariat did not timely file its "Access Agreement," no document clearly states the location and dimensions of its easement, and therefore, it is best characterized as a floating easement. *See, Brumbaugh v. Mikelson Land Co.,* 2008 WY 66, ¶ 21, 185 P.3d 695, 702-03 (Wyo. 2008) (citing *Edgcomb v. Lower Valley Power and Light, Inc.,* 922 P.2d 850, 855 (Wyo. 1996)).  "When a floating easement is created, '[t]he parties are presumed to have intended an easement that is reasonably convenient or necessary under the circumstances.'" *Brumbaugh,* ¶ 21, 185 P.3d at 703.  The primary goal is to determine the intention of the parties.  Any oral or written collateral agreements are the best evidence of the parties' intent.  If there is no agreement or if it is insufficient, a court is to consider the "purpose of the easement, the geographic relationship between the dominant and the servient estates, the use of each of the estates, a comparison of the benefit to the dominant owner to the burden of the servient holder, and the actual use of the servient property by the dominant owner, if any." *Id.*

4

[¶13]  A floating easement is an "'easement for [a] right-of-way which, when created, is not limited to any specific area on [the] servient tenement.'"  *Edgcomb,* 922 P.2d at 855, quoting *Black's Law Dictionary* 640 (6th ed. 1990).  Thus, a floating easement is created when an easement is expressly granted by the servient property owner but not precisely located in the grant.[2]  For example, in *Brumbaugh* and *Edgcomb,* easements for utilities had been expressly created but the location and scope of the easements were not delineated in the relevant documents.  *Brumbaugh,* ¶¶ 19-21, 185 P.3d at 702; *Edgcomb,* 922 P.2d at 852-54.  Unlike a floating easement which rests upon an express, though vague, grant, an implied easement arises from a legal fiction which creates a right based upon the inferred intention of the parties to the conveyance.  *Gray v. Norwest Bank Wyoming, N.A.,* 984 P.2d 1088, 1091-92 (Wyo. 1999).

[¶14]  Given Lariat had an implied easement, the Hansulds challenge the district court's use of the law of floating easements to choose a route that is reasonably convenient or necessary for Lariat's business.  Although their argument is somewhat difficult to understand, they apparently maintain that in order to correctly apply the law of implied easements the district court should have relied only upon the evidence of the common owner's use of burdened property at the time of severance in establishing the location of the easement.

---

[2]  As we recognized in *Brumbaugh,* ¶ 21, n.2, 185 P.3d at 702, n.2, Wyo. Stat. Ann. § 34-1-141 now prohibits the creation of perpetual floating easements.  Section 34-1-141 states:

> (a) Except as provided in subsection (c) of this section, easements across land executed and recorded after the effective date of this act which do not specifically describe the location of the easement are null and void and of no force and effect.
>
> (b) Except as provided in subsection (c) of this section, agreements entered into after the effective date of this act which grant the right to locate an easement at a later date and which do not specifically describe the location of the easement are null and void.
>
> (c) For purposes of this section an easement or agreement which does not specifically describe the location of the easement or which grants a right to locate an easement at a later date shall be valid for a period of one (1) year from the date of execution of the easement or agreement. If the specific description is not recorded within one (1) year then the easement or agreement shall be of no further force and effect.
>
> (d) For purposes of this section the specific description required in an easement shall be sufficient to locate the easement and is not limited to a survey.
>
> (e) For purposes of this section options to obtain easements at a later date shall not be considered easements or agreements pursuant to subsections (b) and (c) of this section and shall be for a period not to exceed seven (7) years.

[¶15]  A comparison of the law of implied and floating easements demonstrates that the lynchpin of establishing and locating both types of easements is the intent of the parties. *Compare Brumbaugh* and *Hansuld I, supra.*  What the Hansulds fail to realize is that the factors considered in establishing the parties' intent with regard to location of both floating and implied easements include the use of the easement by the dominant owner. *Brumbaugh,* ¶ 21, 185 P.3d at 703; *Hansuld I,* ¶ 15, 81 P.3d at 218.  In the floating easement analysis, the court considers the actual use of the servient property by the dominant owner; in the implied easement analysis, the court considers whether the common owner used part of the property for the benefit of the other part. *Id.*  Although the district court may have incorrectly recited the law pertaining to floating easements, its analysis was directed at determining the intent of the common owner, and contrary to the Hansulds' assertion, the district court did consider the actual use of the easement in discerning the parties' intent as to its location.  The district court's reference to floating easements does not, therefore, make a legal difference unless there is insufficient evidence to support the district court's decision as to the location of the implied easement.

### 3.  Easement Location

[¶16]  We turn now to the evidentiary issue concerning the location of the easement, keeping in mind that our standard of review directs that we consider the evidence in the light most favorable to the prevailing party and give that party every reasonable inference that can fairly and reasonably be drawn from the evidence. *Morris,* ¶ 12, 227 P.3d at 330. Lariat presented two options to the district court to locate the easement.  First, it proposed an easement over the entire southerly one hundred feet of the Hansulds' property as set out in the Access Agreement.  In the alternative, Lariat provided evidence demonstrating the path large trucks typically used when traversing the Hansulds' property.  The Hansulds presented their own evidence of the path of smaller trucks through their property.

[¶17]  The district court meticulously discussed the evidence presented at the hearing in its decision letter.  To begin, the district court noted the LLC and Lariat had entered into the Access Agreement which provided Lariat an easement over the southerly 100 feet of the Hansulds' property.  Although the Access Agreement did not create a valid interest in land, we recognized in *Hansuld I,* ¶ 19, 81 P.3d at 219, that it was evidence of the parties' intent that Lariat would have access through the Hansulds' property.  The Hansulds do not direct us to any authority which states that, when an express easement fails but the dominant owner is entitled to access under an implied easement, the document setting out the express agreement should be disregarded altogether.  Indeed, that would seem to be antithetical to ascertaining the conveying parties' intent.  In the end, the district court took the Access Agreement into account, but it also considered evidence that showed the original parties did not use the entire 100 foot area and determined Lariat was not entitled to an easement over the whole area.

[¶18] After rejecting Lariat's claim to the full 100 foot easement set out in the Access Agreement, the district court turned to the evidence offered in support of Lariat's alternative access and the Hansulds' proposal for the access easement. By attempting to grant the 100 foot easement, the LLC obviously intended that Lariat have a generous area for access. The historic need for adequate access is evident because, like Lariat, its predecessor also serviced large diesel trucks and used a portion of the property which would eventually belong to the Hansulds to maneuver the trucks into the diesel service business. The trial evidence included Exhibit S-1, which was a stipulated compilation of information from earlier proceedings between Lariat and the Hansulds. Exhibit S-1 indicated that Mr. Piel had previously testified it was not uncommon for customers of the diesel service business to arrive at the shop with large semi-truck combinations, including three parts: a tractor, a semi-trailer, and a pup.[3]

[¶19] Lariat also presented evidence showing that Wyoming law allows for a single tractor to pull two trailers whose maximum combined length is 81 feet. Mr. Piel testified that the typical tractor is 20 to 25 feet long, making a three-part combination over 100 feet long. Mr. Piel described the difficulties associated with not having enough room to maneuver the large trucks because the Hansulds had limited Lariat's use of the easement area. Given Lariat took over the diesel truck business that had operated on the property when the common owner had it and the truck business used the adjacent property for access, it is a reasonable inference that the historical use included sufficient area for the large diesel trucks to maneuver.

[¶20] Although the district court recognized Lariat's need for a sufficient area for truck access, it also discussed the trial evidence that the actual use of the easement was more limited than Lariat suggested. For example, at different times large commercial signs had been located in the easement area, preventing the trucks from using a portion of it. The district court also considered the fact that the Hansulds' property had historically been, and continued to be, used to display various types of vehicles for sale.

[¶21] Mr. Hansuld testified as to his observations of the truck traffic on the easement area. He provided photographs of an 85 foot long truck traversing his property. One of the Hansulds' witnesses, Ryan Waterbury, is a civil engineer who works for the Hansulds' electric business. He set up a camera and also personally observed the traffic on the easement over a three-week period in 2011. He testified the traffic through the easement area was mostly smaller trucks and cars, although he also witnessed a WB-67 truck using the access route. A WB-67 truck is a tractor with a 53 foot trailer, making a total wheel base of 67 feet. Mr. Waterbury testified the WB-67 truck is the most

---

[3] According to the United States Department of Transportation on-line dictionary, a pup is a short trailer used in combination with another semi-trailer to create a twin trailer. http://www.rita.dot.gov/bts/dictionary/list.xml?search=pup&letter=&=Go.

common on the road. He stated, however, that he did not know whether WB-67 vehicles were the only size of trucks Lariat serviced.

[¶22] Both parties presented expert engineering testimony as to the required space for different size trucks to negotiate the access area.[4] Civil engineer, Eric Saul, testified on behalf of Lariat and presented a proposal for access. Mr. Saul had worked for the Wyoming Department of Transportation (WYDOT) and also as a private highway and street designer. In developing his proposal, Mr. Saul used the WYDOT Access Manual and design standards for driver access and approaches and assumed tractor-trailer combinations of 100 feet would traverse the easement. This assumption was in accordance with Lariat's use of the easement area and, considering that Lariat took over the common owner's diesel truck business, it is reasonable to infer it would have used the area similarly. Mr. Saul also assumed that the trucks, for safety reasons, should maintain their own lanes of travel when entering and exiting the property from the highway. Given this information, Mr. Saul's proposal included a highway approach of 58.5 feet and a travel way that varied in size but narrowed to 35.2 feet at the point where it crossed through the fence into Lariat's property.

[¶23] The Hansulds also provided expert witness testimony. Lewis James is a professional civil engineer with experience in site plan development. Mr. James oversaw the pathway analyses performed by an engineering technician who works for his company, John Bryson. Based upon Mr. Waterbury's recommendation, Mr. Bryson used a WB-67 truck for most of his analyses. The Hansulds' experts' final recommendation included a 40 foot approach and a 40 foot travel way.[5] Their proposal included the assumptions that the longest legal truck (tractor and trailer combination) in Wyoming was 85 feet and that the trucks had to stay within the existing 40 foot curb cut when entering or leaving the highway. Their proposal allowed the trucks to encroach on other lanes of traffic when turning into and out of the property. It was established, during the trial, that the Hansulds' experts' assumption about the maximum length of a legal tractor-trailer combination in Wyoming was incorrect, and, in fact, the law allows tractor-trailer combinations of over 100 feet. When confronted with that information, Mr. Bryson testified that a longer truck could also maneuver through the 40 foot easement.

[¶24] After considering the trial evidence including the Access Agreement and the evidence about the actual use of the easement area based on the types of trucks that access Lariat's (and its predecessor's) diesel truck service business, the district court concluded the proposal suggested by Lariat best reflected the parties' intentions. Although the district court found all of the expert testimony to be credible, it ruled Mr.

---

[4] A truck's pathway when performing turns was referred to by the parties and witnesses as a "sweep."

[5] The Hansulds also presented a separate recommendation which would have narrowed the easement at the fence between the two properties to allow for installation of a 25 foot locked gate. There is no argument on appeal that the district court erred by rejecting that proposal.

8

Saul's was the most convincing because it accurately reflected the parties' actual use of the property. The district court provided the following comparison of the expert witnesses' testimony:

> Mr. James, Mr. Waterbury, and Mr. Bryson all admitted their access models rested on an initial faulty assumption that truck and trailer combinations in Wyoming have a maximum length of 85 feet. When reviewing the merging traffic lanes on those models, which were arbitrarily chosen by Mr. Bryson, they seem to minimize the scope of the easement by having trucks travel across lanes of traffic in order to enter, or exit from, the Hansulds' lot. For example, Exhibit 26-1's Exhibit D has a truck crossing from an exterior lane, into an interior lane, and into a turning lane in order to turn wide enough to enter into the Hansulds' suggested 40 foot entrance. These wide turns and minimization of the easement, as Mr. Saul's testimony reflects, forces Lariat's truck customers to engage in risky lane changes and turning models. It is then likely Lariat's customers would not use the access easement suggested by the Hansulds, because doing so would require them to perform risky driving maneuvers. A wider entrance, as seen in Lariat's proposal, would allow trucks to make tighter turns into the Hansulds' lot. The Court finds the Hansulds' proposal runs contrary to the acknowledged use and purpose of the access agreement— providing Lariat's customers alternative access to that business.

[¶25] Lariat's alternative allowed for the generous access envisioned in the Access Agreement but reduced the easement area by taking into account the actual use. The district court further restricted Lariat's proposed access by narrowing it to accommodate the Hansulds' and their predecessors' historic use of the property to display vehicles for sale. Contrary to the Hansulds' assertions on appeal, it is clear the district court took into consideration the actual use of the easement prior to severance. Applying our standard of review, it is appropriate to infer that Lariat's predecessor used the easement in the same way as Lariat, given it operated the same type of business and used the Hansulds' property for access. Although, in some respects, the district court recited the wrong legal standard, its actual analysis properly focused on the parties' intent as reflected in the actual use of the easement area.

[¶26] The Hansulds also argue that the district court's decision did not adequately take into account the historic 40 foot curb cut. At the time of the trial and apparently for some time earlier, the curb cut from the highway had been 40 feet. The district court's decision

included a 58.5 foot approach from the highway to make the access easier for truck traffic. The Hansulds provided evidence that the typical curb cut in the WYDOT access manual was 40 feet. Mr. Saul stated that the longer trucks could not access the Hansuld property by just using the 40 foot curb cut without swerving into other lanes of traffic. In other words, the longer vehicles could not stay completely within their lane of traffic without running over the curb when entering or leaving the Hansulds' property. Mr. Saul stated that his experience and conversations with WYDOT indicated the curb cut could be altered to accommodate the traffic, if necessary. The district court's decision properly determined the usual path for large trucks that had historically used the access easement and its decision to order an easement which included an approach larger than the typical 40 foot curb cut was not erroneous.[6]

[¶27] Finally, the Hansulds maintain that "[t]he enlargement of the curb cut to 58.5 feet from 40 feet easily absorbs the existing business sign." Thus, they argue, the district court's chosen easement does not reflect the actual use of the property, which included the placement of the large commercial sign. The existing sign was constructed by Petley in the state right-of-way, after he acquired the property in 1996. We note that, contrary to the Hansulds' assertion, the sign itself is not, and never has been, located as close to the highway as a curb cut for the obvious reason that it would impede all traffic.

[¶28] The Hansulds do not direct us to any evidence demonstrating exactly how the district court's chosen easement pathway affects the existing sign. Instead, they focus on some photographs that were admitted into evidence at trial, claiming they show that the district court's ruling expanding the highway approach will interfere with the sign. The photographs show a car parked parallel with the street. The back of the car is next to the sign standards and the front of the car is near the end of a fence that looks like it lines up with the existing curb cut. The reasonable inference from this photograph is that the current sign sits approximately one car length from the curb cut. We do not know the length of the car; nor do the Hansulds directly tie this photographic evidence or any specific measurements to the district court's chosen pathway. Although the exhibits showing the parties' proposals, the district court's chosen pathway and the photographs are included in the record on appeal, the record does not clearly explain where the district court's chosen pathway actually would be in relation to the existing sign. Furthermore, and perhaps more importantly, at the time of Lariat's acquisition of the property from the LLC, the current sign did not exist. There was a different sign on the property advertising "Cummins Diesel" for the truck servicing business and it was further away from the current curb cut.

[¶29] We do know from the trial evidence that large trucks have historically entered and exited the property without interfering with either sign, and according to Mr. Saul, those trucks could not stay within the current curb cut. Thus, it is not necessary for the

---

[6] Obviously, our ruling does not bind WYDOT in any way.

approach to be restricted to the current 40 feet in order to accommodate the historical layout, including the signs. In order to prevail on appeal, the Hansulds must "overcome the onerous burden of persuading this Court that the district court's findings are clearly erroneous." *Keever v. Payless Auto Sales, Inc.,* 2003 WY 147, ¶ 14, 79 P.3d 496, 500 (Wyo. 2003), citing *Maycock v. Maycock,* 2001 WY 103, ¶ 11, 33 P.3d 1114, ¶ 11 (Wyo. 2001). The Hansulds have not met their burden of clearly showing that the district court's chosen pathway would actually interfere with the current sign. Additionally, given the original Cummins Diesel sign was further away than the current sign from the curb cut, the reasonable inference is that the district court's chosen easement path would not interfere with the area where the sign was located at the time of severance. The Hansulds simply have not demonstrated that the district court's final decision was either clearly erroneous or that it erred as a matter of law.

[¶30] Affirmed.