# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 146

OCTOBER TERM, A.D. 2015

November 19, 2015

| | |
|---|---|
| WYO-BEN, INC., a corporation,<br><br>Appellant<br>(Plaintiff),<br><br>v.<br><br>BOYD J. VAN FLEET,<br><br>Appellee<br>(Defendant).<br><br>M-I, LLC, a Delaware limited liability company, d/b/a M-I SWACO,<br><br>Appellant<br>(Plaintiff),<br><br>v.<br><br>BOYD VAN FLEET,<br><br>Appellee<br>(Defendant). | S-15-0049, S-15-0050 |

*Appeal from the District Court of Big Horn County*
*The Honorable Robert E. Skar, Judge*

*Representing Appellant Wyo-Ben, Inc.:*
  Randy L. Royal of Randy L. Royal, P.C., Greybull, Wyoming

*Representing Appellant M-I, LLC:*
  Steven F. Freudenthal of Freudenthal & Bonds, P.C., Cheyenne, Wyoming

*Representing Appellee Boyd J. Van Fleet:*
    S. Joseph Darrah of Darrah Law Office, P.C., Powell, Wyoming

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1] Boyd Van Fleet owns a parcel of real property in the Potato Ridge area of Big Horn County, Wyoming. The property is approximately five miles east of Greybull. A road crosses a corner of his parcel, and a dispute arose with Appellants Wyo-Ben, Inc. and M-I, LLC, d/b/a M-I Swaco concerning their ownership and right to use that portion of the road in conjunction with bentonite mining operations. The district court found that Appellants failed to prove their claims for adverse possession and prescriptive easement, and that Van Fleet owns the land where the road traverses his property free of any right for them to use it. We affirm.[1]

## ISSUES

[¶2] Appellants raise a number of interrelated issues,[2] which can be refined into the following dispositive questions:

1.       Did the district court err in determining that Appellants did not meet their burden of proving the elements of their claim for adverse possession?

2.       Did the district court err in determining that Appellants did not meet their burden of proving the elements of their claim for prescriptive easement?

## FACTS

[¶3] The State of Wyoming issued a gentleman by the name of D.K. Jones a patent for the property involved in this case in 1955. A couple of decades passed before he and his wife (who was on the title by that time) entered into a mining lease which covered their

---

[1] Wyo-Ben and M-I separately appealed the district court's *Judgment and Order* and filed nearly identical briefs. We will consolidate and consider their appeals together for purposes of this opinion. Although this matter was appealed and briefed before the most current amendments to Wyoming Rules of Appellate Procedure went into effect on July 1, 2015, we note the path that ought to be considered after that date:

> If two or more parties are entitled to appeal from a judgment or order, and their interests are such as to make joinder practicable, they may file a joint notice of appeal, or may join in appeal after filing separate notices of appeal. Appellants filing jointly shall file only one combined brief and, if applicable, one combined reply brief.

W.R.A.P. 1.06 (LexisNexis 2015).

[2] Among the issues briefed by the Appellants is whether a period during which the Wyoming State Farm Loan Board owned what is now Van Fleet's property through foreclosure interrupted any period of adverse possession that began before foreclosure. The decision we reach does not require us to address this issue. Additionally, Appellant M-I also raises an issue as to whether language in the deed granting Van Fleet's interest subordinates the interest he acquired to its right to use the road. We will briefly discuss this issue, although it has little merit. *See* ¶¶ 37-38, *infra*.

property and some neighboring lands with Wyo-Ben on November 1, 1970. This conveyance is known as the Jones-Manning lease.

[¶4]    The lease allowed Wyo-Ben to mine bentonite[3] from the subject property "together with the right to construct all buildings, and to make all excavations, openings, roads and other improvements or alterations upon the leased premises, which are or may become necessary or suitable for the mining, storing and removing of Bentonite from said premises and the processing thereof." The term of the lease was "until October 31, 1973, and so long thereafter as Bentonite may be mined, produced or marketed from said premises."

[¶5]    Wyo-Ben established a bentonite mine pit on the lease, and it also constructed a road to access the lease and haul the bentonite it mined to its processing plant.[4] Mining was brief, however, as Wyo-Ben apparently ceased operations on the property by August of 1973. Wyo-Ben would have stopped paying royalty on the bentonite it mined at this point, but neither party to the lease took any action to terminate it as a matter of record after mining stopped.

[¶6]    Soon thereafter, and prior to October 31, 1973, the mine pit was reclaimed by backfilling it.[5] As a result, the then-existing road was wiped out in the area of the pit. Wyo-Ben then rebuilt the road over or near the backfilled pit in order to haul bentonite from claims lying beyond the property to the south, which would not have been permitted by the Jones-Manning lease. Wyo-Ben did not acquire a new easement over what is now Van Fleet's property, and from what the record tells us, it did not ask permission to continue to use the road. At the time of trial in this case, this road was Wyo-Ben's sole access to its mining claims south of Van Fleet's property, at least for trucks large enough to haul bentonite in commercially reasonable quantities.

[¶7]    The road is referred to locally as "the haul road." It begins at a turnoff on U.S. Highway 14 east of Greybull and meanders southeast through state, federal and private lands, including 767.5 linear feet of Van Fleet's property. This portion of the road is approximately a mile from the highway. Wyo-Ben has historically used thirteen miles of the road. At Van Fleet's property, it is about 56 feet wide, and it is in relatively the same condition and location today as it was in the 1970s. The following aerial photograph illustrates the road as it crosses Van Fleet's property.

---

[3] Bentonite is useable for a number of purposes, including most notably as a component of drilling mud used in oil and gas exploration.
[4] There was some indication in the record that perhaps the road existed before the Jones-Manning lease, but that appears to be speculation.
[5] The 1969 Open Cut Reclamation Act was in effect at that time, and it only required backfilling for reclamation.

2



[¶8]   Wyo-Ben utilizes a contractor to remove overburden and transport bentonite from its leases or claims to its processing plant.  The contractor's trucks are not marked as belonging to Wyo-Ben; instead, they bear the contractor's name and/or logo. It would therefore not have been possible for an observer to tell that the trucks were operating on Wyo-Ben's behalf.  These "haul trucks" are and historically have been large tractor-trailer-pup rigs.

[¶9]   The trucks make up to 100 round trips per day, meaning that they would pass through Van Fleet's property up to 200 times a day, at least at times.  Van Fleet claims that the volume of truck traffic has increased in recent years, and that trucks have passed as often as every two minutes.  He and a person living on his property testified that the operation generates a great deal of noise and dust, and that it disturbs his sleep if hauling continues into the night.

[¶10]  The contractor grades and maintains the road as needed, at Wyo-Ben's expense.  It also sprinkles water on the road to keep the dust down.  Wyo-Ben pays for culverts and

3

cattle guards, and for their repair, maintenance, and replacement. The cattle guards are a convenience for Wyo-Ben's haul contractor, because otherwise they would have to stop their trucks to open and close gates to prevent cattle grazing on adjacent lands from getting out.

[¶11] Through the years, the haul road has been utilized not only by bentonite companies like Appellants to service mines on nearby lands, but it also has been used by various members of the public including local ranchers, hunters, and outdoor enthusiasts. Van Fleet uses the road to access and put cattle on and remove them from his nearby state leases. A Wyo-Ben representative testified that it could not practically restrict access to the road because of the frequency with which its contractor's trucks use it – as already noted, the use of gates is impractical.

[¶12] There were no "No Trespassing" signs on the road until Van Fleet erected them at his property boundaries in March of 2011. Wyo-Ben did place signs on other portions of the road for the safety of those who used it. None of the signs bear Wyo-Ben's name or logo, so a user of the road would probably not know who set them. The signs advise users to watch for traffic coming from "the wrong direction," of blind hills, and that the road could be watered to keep dust down. The road also has speed limit signs and signs prohibiting stopping. Wyo-Ben posts travel-at-your-own-risk signs when the road is wet from rain or snow and may become rutted. There was testimony that at one time there was a sign indicating that the road was a "Private Haul Road" at its intersection with Highway 14, but that the sign fell into disrepair. This sign would have been about a mile from Van Fleet's property. It did not advise the public that it could not use the road (the signage on the road in fact indicated the opposite), and the record tells us nothing about when it was erected. None of these signs were on Van Fleet's deeded land, although near its south boundary, there is a sign which says only "Caution – Mining Activity."

[¶13] Where the road crossed Van Fleet's property, it has historically been fenced off on the south side about 50 to 80 yards away. The record is vague as to who erected the fence – the most that can be made of it is that the fence was originally built by one of Van Fleet's predecessors in interest and fell into disrepair, and that it might have been repaired and upgraded by the entity responsible for recovery of abandoned mine lands. There is no evidence to suggest that Wyo-Ben erected the fence in order to establish dominion over that portion of the road.

[¶14] M-I came on the scene belatedly, evidently around 2003 or 2004, and therefore less than ten years before this matter came to a head. It mines south of where Wyo-Ben does. The Department of Environmental Quality, which regulates the environmental aspects of mining, encourages mining companies to share roads in order to minimize environmental damage. M-I has an arrangement (which has not been described in great detail in the record) that allows it to use the haul road that Wyo-Ben claims it owns. When it is mining, it assists with road maintenance and dust control. As is the case with

4

Wyo-Ben, the haul road is M-I's sole access to its claims or leases, at least for haul trucks.

[¶15] Van Fleet acquired his property in April of 2004. It had changed hands several times since Jones was granted his patent in 1955. Van Fleet inspected the property before he purchased it, and he saw the haul road, but at the time the property boundaries had not been surveyed, and so he did not know for certain that the road was on his land. Sometime around 2009 or 2010, he had the land surveyed for fencing purposes and verified that the road crossed the corner of his property.

[¶16] After he realized that a portion of the haul road was on his property, Van Fleet approached Wyo-Ben about the situation. Wyo-Ben did not produce documentation of an easement or other written authorization to cross his land. He offered to let Wyo-Ben continue to use the road if it would pay him a base fee and a payment per load to do so, but it rejected that offer and made a counteroffer that was not appealing to him. He then gave Wyo-Ben's hauling contractor and M-I notice of criminal trespass, which brought the situation to a head.[6]

[¶17] Wyo-Ben promptly sued Van Fleet in the district court for Big Horn County, asserting several claims, including prescriptive easement and adverse possession. M-I soon followed suit and asserted similar claims. M-I's claims for adverse possession and prescriptive easement required either the use of "tacking" of or some other basis to rely upon Wyo-Ben's alleged continued use, although, as discussed below, it contends that language in Van Fleet's deed validated its use. The cases were consolidated, and Van Fleet answered[7] and counterclaimed for, *inter alia*, trespass/nuisance, damage to property, ejectment, a declaratory judgment, an order quieting title, and an injunction prohibiting Appellants from using the portion of the road on his property.

[¶18] All of the claims were heard at a bench trial, and the district court issued a decision letter ruling generally in favor of Van Fleet. A *Judgment and Order* incorporating the decision letter was entered soon thereafter, ordering, *inter alia*, that title in the subject property was quieted in favor of Van Fleet, that Van Fleet's claim for ejectment was granted, and that Wyo-Ben and M-I was permanently enjoined from traversing or entering Van Fleet's property without his express permission.

---

[6] Van Fleet and Wyo-Ben also have a dispute concerning the latter's right to travel over Van Fleet's state leases and the use of water from a nearby canal for dust control. Those issues are not before us.

[7] Wyo-Ben and M-I applied for a temporary restraining order prohibiting Van Fleet from interfering with their truck and business traffic on the haul road that crosses his property. The TRO was granted. The district court subsequently held a hearing on whether to convert the TRO to a preliminary injunction. A preliminary injunction granting the same relief as the TRO was issued and then dissolved after the court reached the merits after trial. Under Wyoming Rule of Civil Procedure 65(a)(2), the transcript of the preliminary injunction hearing (which is in the record) and any exhibits received there became part of the record of the trial.

[¶19]   Appellants timely perfected their respective appeals of that final judgment.

## STANDARD OF REVIEW

[¶20]   Our standard of review of a district court's decision after a bench trial has been clearly articulated:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
>
> With regard to the trial court's findings of fact, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.
>
> The district court's conclusions of law, however, are subject to our *de novo* standard of review.

*Hansuld v. Lariat Diesel Corp.*, 2015 WY 12, ¶ 8, 341 P.3d 428, 431 (Wyo. 2015) (citations and quotation marks omitted).

## DISCUSSION

***Adverse Possession***

6

[¶21] Appellants Wyo-Ben and M-I generally contend that the district court erred in finding that they failed to prove their claim of adverse possession.[8] "To establish adverse possession, [the claimant] must demonstrate actual, open, notorious, exclusive, and continuous possession of the disputed parcel which is hostile and under claim of right or color of title." *Ruby River Canyon Ranch, Ltd. v. Flynn*, 2015 WY 74, ¶ 10, 350 P.3d 748, 752 (Wyo. 2015) (citing *Graybill v. Lampman*, 2014 WY 100, ¶ 27, 332 P.3d 511, 519 (Wyo. 2014)). Possession must be for the statutorily prescribed period of ten years. *Ruby River Canyon Ranch, id.*; Wyo. Stat. Ann. § 1-3-103 (LexisNexis 2015).

[¶22] Without a clear showing to the contrary, a person who has occupied the land for the statutory period, in a manner plainly indicating that he has acted as the owner thereof, is entitled to a presumption of adverse possession, and the burden shifts to the opposing party to explain that possession. *Ruby River Canyon Ranch, id.* (quoting *Helm v. Clark*, 2010 WY 168, ¶ 8, 244 P.3d 1052, 1057 (Wyo. 2010)). However, if a claimant's use of the property is shown to be permissive, the claimant cannot acquire title by adverse possession. *Ruby River Canyon Ranch*, ¶ 10, 350 P.3d at 752. "We have said that an adverse possession claimant must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest." *Id.*, ¶ 10, 350 P.3d at 753 (citations and quotation marks omitted). If conflicting evidence is presented, it is a question of fact as to whether adverse possession has been proven. *Graybill,* ¶ 31, 332 P.3d at 521; *Hillard v. Marshall*, 888 P.2d 1255, 1260-61 (Wyo. 1995).

[¶23] The positions the parties presented at trial are easily summarized. Wyo-Ben claimed that although it had obtained permission to traverse Van Fleet's lands decades earlier by the Jones-Manning lease, that lease had expired. The successors of the original lessors were not shown to have known of the lease, and its use of the land was certainly obvious – its contractors hauled bentonite in large semi-trucks, maintained the road, cattle guards, and culverts, and placed signs on portions of the roadway for the benefit of those using it.

[¶24] On the other hand, Van Fleet pointed out that Wyo-Ben had entered the land with permission of the original lessors, and that it did not prove that it ever directly communicated to landowners that it considered its use to have changed from permissive to adverse. The road was used by the public, and Wyo-Ben did not attempt to prevent anyone from using it. It was a benefit to all who used it, including Van Fleet and his predecessors, and so it was understandable that the landowner would tolerate that use, even though it was quite extensive.

---

[8] M-I specifically disclaimed any independent claim of adverse possession at trial, but filed a brief supporting Wyo-Ben's claim, evidently because it would have rights derivative of those of Wyo-Ben or because it had permission from Wyo-Ben to use the road.

[¶25]  We find that our analysis of Appellants' adverse possession claim can be limited to the element of hostility.  The evidence established that Wyo-Ben's construction and use of the road on the subject property in the early 1970s was permissive because of the lease of November 1, 1970.  *See* ¶¶ 3-5.  While Wyo-Ben contends that the lease unquestionably expired on October 31, 1973, as did its right to use the property, there was evidence to the contrary.

[¶26]  For example, Wyo-Ben sought a loan with a bank and represented that the lease was still valid and subsisting as late as 1984.  Wyo-Ben represented to its bank that the lease is a "valid, subsisting lease, superior and paramount to all other leases respecting the properties to which they pertain, and have not been assigned" and that "(g) each of the . . . Leased Mining Claims is in effect."  The lease at issue was listed as a Lease Mining Claim in the mortgage to the bank.  The mortgage was then recorded in the Big Horn County, Wyoming real estate records in 1984, and was on record until it was satisfied in 1994.  Although it is difficult to predict how litigation over the continuing validity of the lease would come out, this evidence supports a conclusion that Wyo-Ben's use of the road crossing Van Fleet's property remained permissive throughout the years as it represented that it had a valid lease permitting a haul road.[9]

[¶27]  This Court has held that "[a] permissive user may change his possession into adverse title with a clear, positive, and continuous disclaimer and disavowal of the title of the true owner brought home to the latter's knowledge."  *Hutchinson v. Taft*, 2010 WY 5, ¶ 19, 222 P.3d 1250, 1254 (Wyo. 2010).  "There must be either actual notice of the hostile claim or acts or declarations of hostility so manifest and notorious that actual notice will be presumed in order to change a permissive or otherwise non-hostile possession into one that is hostile."  *Id.* (quoting *Kimball v. Turner*, 993 P.2d 303, 306 (Wyo. 1999)).  As one commentator has observed, "[i]f possession is permissive in the beginning, it can be changed to one of hostility only by the most unequivocal conduct on the part of the adverse claimant."  10 David A. Thomas, *Thompson on Real Property* § 87.10, at 148-49 (3d ed. 2013).

[¶28]  The district court concluded as follows after hearing and seeing the witnesses for both parties testify and reviewing the documentary evidence in the case:

> 17.  No evidence was presented by Wyo-Ben or M-I of ever having paid real property taxes on the 767.50 feet in dispute.
>
> 18.  No objective evidence was presented by Wyo-Ben or M-I that they ever communicated corporately, directly by letter or

---

[9] Wyo-Ben argues that the expired lease was included simply because it was administratively considered as part of its mining permit.  However, we view the facts in the light most favorable to Appellee Van Fleet, and when we do so, we must recognize that Wyo-Ben represented the lease to be valid as late as 1994.

8

orally, through its employees, officers, directors or attorneys to anyone that they claimed ownership of the 767.50 feet in dispute until [Van Fleet] took a position of his superior right to the 767.50 feet when he noticed [Wyo-Ben's hauling contractor] about trespass in April 2011.

19. No objective evidence was presented by Wyo-Ben or M-I that they ever communicated to [Van Fleet] or his predecessors in title after Jones [the original mining lessor] that they had a right to use the 767.50 feet in dispute for hauling purposes.

20. Other than the use of the haul road itself, no objective evidence was presented by Wyo-Ben or M-I of either companies' communication with anyone prior to April 26, 2011 of their hostile use of the 767.50 feet against the wishes of [Van Fleet] or his predecessors in title after Jones.

21. Other than the passage of time, there was no evidence presented by Wyo-Ben or M-I that the permission granted by the Jones-Manning lease to Wyo-Ben for the use of the 767.50 was ever revoked by Jones or anyone until April 21, 2011 when [Van Fleet] noticed [Wyo-Ben's hauling contractor] about trespass.

22. There was no objective evidence presented by Wyo-Ben or M-I that either company communicated to anyone their intent to hold adversely, whether by ownership under an adverse possession theory or use under a prescriptive easement theory, the 767.50 feet of roadway in dispute prior to April 26, 2011.

23. Although representatives of Wyo-Ben now claim they have subjectively claimed the right to use the roadway for the prescriptive period of ten (10) years and that they did so hostilely as to the landowners, there is no objective evidence presented to support their assertions.

[¶29] Regardless of when the lease terminated, although there was evidence that showed the company has used, maintained, and sometimes signed the road over the years, there was no evidence that Wyo-Ben clearly disclaimed and disavowed the true owner's title or otherwise gave actual notice after it contends that its claim became hostile. It could have done so in a number of ways, which would have hoisted the flag of hostility. *See, e.g.,*

*Graybill*, ¶ 36, 332 P.3d at 522; *Helm*, ¶ 10, 244 P.3d at 1058; *Stansbury v. Heiduck*, 961 P.2d 977, 980 (Wyo. 1998).

[¶30]  In the absence of an express disavowal, the district court had to determine whether Wyo-Ben engaged in acts so manifest, notorious, and hostile to title that actual notice could be presumed to change permissive or otherwise non-hostile use into hostile possession. *See Hutchinson*, ¶ 19, 222 P.3d at 1254-55.  Although Wyo-Ben maintained and signed the road with safety advisories, it benefitted from doing so by having a better road to haul bentonite and perhaps avoiding liability for motor vehicle accidents by warning of hazards.  It continued to do what it had done under the original Jones-Manning lease—it hauled bentonite and kept the road in adequate condition to do so.

[¶31]  After weighing these facts, the district court found that Wyo-Ben had not proven that it had given express notice or engaged in the kind of unequivocal conduct sufficient to constitute actual notice of its hostile possession.  Wyo-Ben failed to convey the clear message that it intended to possess the land as its own, and thus to challenge Van Fleet's or his predecessors' title or to oust them from the portion of their property that the road crosses.  When we apply our standard of review, we are not left with a definite and firm conviction that a mistake was made when we view the evidence in the light most favorable to Van Fleet.  The district court's ruling on the adverse possession claim was therefore not clearly erroneous.

*Prescriptive Easement*

[¶32]  Had Wyo-Ben prevailed on its claim of adverse possession, it would have owned the area covered by the road in fee simple, subject to any encumbrances, other easements, etc., which might have existed.  As an alternative, Appellants both claim an easement by prescription, which would allow them to use the road even though neither own it.  Appellants bore the burden of proving each of four elements necessary to establish an easement by prescription: "1) proof of adverse use; 2) claim of right under title or claim of right; 3) use which puts the owner of the subservient estate on notice of his claim; and 4) continuous and uninterrupted adverse use for at least ten years."[10] *Powder River Ranch, Inc. v. Michelena*, 2005 WY 1, ¶ 9, 103 P.3d 876, 880 (Wyo. 2005).  They have a heavy burden to establish adverse use in Wyoming, where prescriptive easements are not favored. *Id.*  "In fact, we generally presume that use of a private roadway by a neighbor is permissive." *Id.*  "[N]eighborliness and accommodation to the needs of a neighbor are landmarks of our western life-style." *Id.* (quoting *Shumway v. Tom Sanford, Inc.*, 637 P.2d 666, 670 (Wyo. 1981)).

---

[10] M-I has an obvious problem beyond the need to prove adverse and hostile intent – it did not use the road for ten years before Van Fleet blocked its access.  Whether Wyo-Ben could allow it to use its prescriptive easement, if it had one, is an issue we need not address because of the grounds on which we resolve this appeal.

[¶33]  While there is a presumption of permissive use, it is rebuttable.  *Powder River Ranch*, ¶ 10, 103 P.3d at 880 (citing *Yeager v. Forbes*, 2003 WY 134, ¶ 35, 78 P.3d 241, 256 (Wyo. 2003)).  In order to rebut this presumption, Appellants were required to prove that their claimed hostile and adverse use was brought home to the owners of the land in question.  *Id.*  That use must have been "inconsistent with the rights of the owner, such that the use would entitle the owner to a cause of action against the claimant, without permission asked or given."  *Powder River Ranch,* ¶ 10, 103 P.3d at 880 (quoting *Coleman v. Keith*, 6 P.3d 145, 148 (Wyo. 2000)).  Put plainly, our law "requires a manifestation of hostile and adverse intent to use a road, even though it will likely result in revocation of permission to use the road across the neighbor's land." *Id.* (quoting *Coleman*, 6 P.3d at 147-48.)

[¶34]  As this Court explained over thirty years ago:

> While we recognize that this disposition has the possibility of permitting termination of long and historic uses of unimproved roads, we are firm in our conviction that the best rule for the State of Wyoming is one which requires that a landowner claiming an easement by prescription in an unimproved road crossing the lands of his neighbor must assume the burden of establishing that his intention to make a hostile use of the road adverse to the interests of his neighbor was brought home to the neighbor in a clear and unequivocal way. His subjective intent will not be considered material, and while it is likely true that a manifestation of his hostile and adverse intent will result in revocation of permission to use the road across the neighbor's land, this is the best posture for the law to assume in the State of Wyoming. The claimant cannot rely upon a presumption arising out of the open, notorious, continuous and uninterrupted use for the prescriptive period, but in the absence of more that use will be presumed to have been with permission. To rebut this presumption the claimant must introduce evidence of the facts which demonstrate the manner in which the hostile and adverse nature of his use was brought home to the owner of the adjacent land.

*Shumway*, 637 P.2d at 670.

[¶35]  As with the adverse possession claim, whether there was a sufficient manifestation of hostile and adverse intent was a question of fact.  The district court determined that Appellants failed to meet their burden of proving that their use was sufficiently hostile and adverse to unequivocally bring home the nature of their claim to any owner of the

11

land up to Van Fleet. *Compare Coleman,* 6 P.3d at 147-48 *and Shumway*, 637 P.2d at 668-70 *with Powder River Ranch,* ¶¶ 9-19, 103 P.3d at 880-82.

[¶36] Although the extensive use Wyo-Ben and later M-I made of the road may seem sufficient to strain its relationship with the most amiable of neighbors, the character of the land in question, the benefit to the property owner and others of having a road like this one, and the economic benefit the community derived from Appellants' activities make the former landowners' forbearance understandable. We cannot say that the claimed adverse nature of that use would have been unequivocally brought home to reasonable landowners in their position. The district court did not clearly err in finding that it was not. Although it is remarkable that at some time in the past, Wyo-Ben staked its ability to develop valuable mineral resources on such fragile theories, rather than obtaining an easement by agreement or condemnation, that is what happened.[11]

### Deed to Van Fleet

[¶37] M-I makes one additional argument, which we will briefly mention. The warranty deed conveying title to Van Fleet provides that the conveyance was "SUBJECT TO ALL RESERVATIONS, RESTRICTIONS, RIGHTS OF WAY OR EASEMENTS OF RECORD, OR **APPARENT UPON EXAMINATION**." (Emphasis added). Van Fleet admits that he saw the road before buying the property – it is approximately 56 feet wide and would be hard to miss, especially with bentonite haul trucks travelling over it.

[¶38] M-I argues that the above language establishes that Van Fleet took the property subject to its right to use the road. We disagree. This language is an exception to the warranties in the deed. If in fact Wyo-Ben or M-I had a prescriptive easement, and it was apparent on examination of the property (as this road is), the grantors would not be liable under those warranties. 14 Richard R. Powell, *Powell on Real Property* § 81A.06[2][d] (2015) (claims or encumbrances excepted by the grantor do not constitute violations of the covenant of warranty). The deed has nothing to do with the rights of a third party like M-I. Its claim had to rise or fall on its own merits, and the district court's ruling that it was not proven is not clearly erroneous for reasons already explained. The deed adds nothing to that analysis.

### CONCLUSION

[¶39] We affirm the district court in all respects.

---

[11] We emphasize that this opinion addresses only the small portion of the road on Van Fleet's property. The record does not tell us what transpired with the federal, state, and private land over which the remainder of it passes.