**Mary TURNER, Appellant (Defendant),**

**v.**

**FLOYD C. RENO & SONS, INC., a Wyoming corporation, Appellee (Plaintiff).**

**No. 86–228.**

Supreme Court of Wyoming.

Feb. 17, 1989.

Wade Brorby, Morgan, Brorby, Price & Roberts, Gillette, for appellant.

Peggy Taylor Pfau, Daly, Maycock, Anderson & Taylor, Gillette, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT, and MACY, JJ., and BROWN, J., Retired.

THOMAS, Justice.

The primary question raised in this case is whether the district court could award damages for trespass and title to land to one who claimed ownership by virtue of adverse possession in the absence of a finding of all of the elements of adverse possession.[1] A collateral question which must be resolved is whether the evidence of record would justify the trial court in finding all of the elements of adverse possession as to all of the lands in question. We

---

**1.** The trial court invoked its discretionary authority to make special findings in accordance with Rule 52, W.R.C.P.

hold that, in order to award damages for trespass or title to land when ownership is based upon a claim of adverse possession, the court, in an instance such as this, must find that all of the elements of adverse possession have been established. In the absence of finding all of the elements, the judgment of the district court must be reversed, which we do. We further hold that the record does not justify a claim of hostile possession to those lands situated in Section 27, and the award of damages for trespass upon, and title to, those lands must be reversed. The case is reversed and remanded for further consideration by the district court in accordance with this opinion, but with direction to delete any award of damages or adjudication of title relating to lands situated in Section 27.

Mary Turner, as appellant, articulates two issues in her brief. They are:

"1. Does the evidence educed at trial support the trial court finding of adverse possession by the plaintiff/appellee against the property of the defendant/appellant as the same is located in Campbell County, Wyoming?

"2. Was the award of damages to the plaintiff/appellee properly calculated?"

Floyd Reno and Sons, Inc. (Reno) does not offer any statement of its own with respect to the issues and is deemed to be satisfied with the issues articulated by Turner.

Turner and Reno are adjoining landowners. In the summer of 1983, Turner employed a surveyor to establish the correct boundary lines between her land and the Reno land. The survey confirmed that existing fences separating the lands of Turner and Reno did not follow the true boundary lines. Turner then employed contractors to build new fences on the true boundaries and remove existing fences.

Reno then filed suit contending that Turner was trespassing by virtue of the fencing activities; that Reno was the owner of certain lands in the west half of Section 27 and the east half and the south half of Section 33 by virtue of adverse possession; or, alternatively, that Reno was entitled to an easement with respect to those lands encompassed within existing fences. By way of relief, an injunction was sought to prohibit the building of the fence; actual and punitive damages were sought; a judgment that Reno had acquired title by adverse possession of the lands in question was requested or, in the alternative, that the claimed easement existed. Prior to trial, the parties conducted negotiations with the goal of reaching a settlement. Reno claimed that an oral settlement was reached, but Turner refused to sign it after Reno's counsel had reduced it to writing. Reno then persuaded the court to adopt the oral settlement, and an order to that effect was entered. When Turner appealed that order, we reversed the trial court, holding that an oral settlement constitutes an attempt to transfer an interest in land in violation of the statute of frauds and is void. *Turner v. Floyd C. Reno & Sons, Inc.*, 696 P.2d 76 (Wyo.1985). The case was remanded to the district court and, following discovery, a trial was held. The trial court decided the case in favor of Reno, quieting title in it to the disputed land, and awarding damages in the amount of $9,003.17.

All of the land in dispute is located in Campbell County. Reno has title by conveyance to the east half of Section 27 and all of Section 34 in Township 42 North, Range 73 West, 6th P.M., and to Section 4 in Township 41 North, Range 73 West, 6th P.M. Turner owns the record title to the west half of Section 27 and all of Section 33 in Township 42 North, Range 73 West, 6th P.M. The true boundary separating the lands owned of record is not in dispute. That boundary line runs north to south separating the east one-half and the west one-half of Section 27; it then turns west following the boundary separating Sections 27 and 34 to the northwest corner of Section 34; it then turns south along the boundary separating Sections 33 and 34 to the southeast corner of Section 33; and then west along the boundary separating Sections 33 and 4. An exhibit which demonstrates the boundary line and reflects existing fences is attached as Appendix A.

Many years earlier, predecessors in interest of Turner and Reno constructed fences

which separated their lands but were not situated on the true boundary lines. The discrepancy was most marked in Section 27 in which the fence runs diagonally from a point approximately 190 feet west of the true boundary line at the northern end to a point 1,455 feet west of the true boundary line at the southern end. The fence separating Sections 33 and 34 deviated only fifty-three feet at the south end from the line between the two sections. As to the fence separating the lands in Section 33 from those in Section 4, that deviation ranged from 153 feet at the west end of the section line to 196 feet at the east end of the section line.

There was no evidence presented at trial with respect to the actual construction of the original fences separating these lands. There was information relating to the re-building of earlier fences. Mathew Reno, the corporate president, recalled that his father had rebuilt an existing fence on Section 27 in 1948. Mathew's brother, Floyd Reno, testified that he helped rebuild a fence on Section 27 in either 1947 or 1948. Neither of them could say when the fence was erected initially, except that it was in existence prior to 1947. Mathew Reno testified that the fence between Section 33 and Section 34 was rebuilt in 1957 or 1958, and he thought it was initially constructed in 1920. As to that fence, Floyd Reno's testimony was that his father told him the fence was first built in 1919 and had been based on the 1883 public land survey. Mathew Reno testified about the fence between Section 33 and Section 4. He said that his knowledge of the history of the surrounding country caused him to believe that the fence was first constructed in 1919 or 1920 but, again, his personal knowledge was limited to the rebuilding of the fence in 1957 or 1958. There also was testimony that the entire fence line was repaired periodically by Reno.

The surveyor who worked for Turner testified that, in establishing the correct boundaries of these lands, he observed several monuments from prior surveys which did substantially coincide with his survey so far as the boundaries were concerned. He located several boundary markers which had been set by the Bureau of Land Management during a 1955 survey. The sightings that he established and the BLM monuments were "fairly close" to the natural monuments which had been identified in the 1883 survey.

With respect to the deviation of the fence in Section 27, Mathew Reno testified that he first became acutely aware that it was not on the correct boundary in 1972, in the course of a conversation with Leland Turner, Mary Turner's son. He further testified on cross-examination that, when he was informed of the boundary discrepancy by Leland Turner, he stated his understanding that the discrepancy between the fence line and the true boundary was in accord with an exchange of land use agreement pursuant to which the Turners were permitted to use portions of land leased by Reno in exchange for Reno's use of the disputed land in Section 27. Mathew Reno further admitted to a conversation with George Turner, another of Mrs. Turner's sons, that took place sometime between 1978 and 1982, at which time he again stated that any discrepancy was satisfied by the trading of land use. Mrs. Turner's testimony, to the effect that Mathew Reno advised her that he was aware that the fence was not on the true boundary and that if she ever desired to have the land re-surveyed she then could move the fence to the true boundaries, was not contradicted. In addition, Thomas Kass, Mrs. Turner's grandson who had worked on the Turner ranch, testified by deposition. Kass testified about several conversations he had with Mathew Reno relating to the correction of the discrepancy between the existing fence line and the true boundaries. Kass stated that Mathew Reno had said that he would agree to what Mrs. Turner decided, but that he would prefer to purchase the Turner lands lying to the east of the existing fence line in Section 27, or accomplish some further suitable land trade. There was no testimony at trial which conflicted with or contradicted this testimony. Furthermore, it is clear that Turner paid the taxes on the disputed lands for all prior years.

Following trial, the court made these findings of fact with regard to ownership of the disputed land:

"1. With regard to Section 27: a) the west half was purchased by the defendant from the Moore's in 1972; b) the east half was acquired by the plaintiff's in 1973; c) the plaintiffs began leasing the east one-half of Section 27 from the former owners in 1927; d) the original fence was reconstructed in 1948; e) the parties and their predecessors in title believed the original fence line to be the property boundary from 1927 until 1983.

"2. With regard to Section 34: a) the property was acquired by the plaintiff in October of 1938; b) the fence between Sections 34 and 33 was first built in 1920 and reconstructed in 1957 and 1958; c) both parties and their predecessors in interest believed the original fence line to be the property boundary from 1920 until 1983.

"3. With regard to Section 4: a) the plaintiffs predecessors in interest acquired the property in 1935; b) the original fence between Section 4 and Section 33 was constructed in 1920 and reconstructed in 1957 and 1958; c) from 1920 until 1983 both parties and their predecessors in interest believed the original fence to be the boundary line between their property.

"4. With regard to all the land in controversy, the plaintiff held said land in actual open, notorious, exclusive, hostile, and continuous possession for a period of more than ten years.

"5. Defendant tore down the old fence on the property adversely possessed by plaintiffs and erected a new one."

\*   \*   \*   \*   \*   \*

The elements of adverse possession have been definitively established in Wyoming. In order to establish title in this way, a claimant must demonstrate actual, open, notorious, exclusive and continuous possession for the statutory period, hostile, and under color of title or claim of right. *Ferguson v. Ferguson*, 739 P.2d 754 (Wyo. 1987); *Farella v. Rumney*, 649 P.2d 185 (Wyo.1982); *Shores v. Lindsey*, 591 P.2d

895 (Wyo.1979); *City of Rock Springs v. Sturm*, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1 (1929). It is clear that the findings of fact by the trial court omitted any finding as to whether Reno's claim was under color of title or claim of right. No deed to Reno embraced the disputed property, and it could not assert color of title. *Doenz v. Garber*, 665 P.2d 932 (Wyo.1983). As to some of the land in dispute, a claim of right may be inferred from the record, but it is for the trial court to evaluate the evidence to sustain that element of the cause of action upon reversal and remand.

■ With respect to that portion of the land which is situated in Section 27, Mathew Reno, Reno's president, testified that Reno's possession was premised upon an exchange of land use. Mathew Reno's testimony is unrefuted and is consistent with the claim of Mary Turner, when she testified, that Mathew Reno agreed to the relocation of the fence. The record does not support the finding of the trial court that Reno's possession of the land in Section 27 was hostile; the evidence is only consistent with a finding that the possession was consensual. This court has held that:

"In order to establish title through adverse possession of real estate, the possession must be 'with the intent' to assert such adverse claim against the true owner, thus the intention of the parties involved, most often is controlling, *Bryant v. Cadle*, 1909, 18 Wyo. 64, 86, 104 P. 23, 27, modified on rehearing, 18 Wyo. 95, 106 P. 687, with doubtful situations to be submitted to the trier of facts. The intention may be established by words or acts. *City of Rock Springs v. Sturm*, 1929, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1. In the situation here, rather than establishing any intent on the part of plaintiffs to claim title to the disputed land, the evidence presented reflects exactly the contrary." *Gray v. Fitzhugh*, 576 P.2d 88, 90 (Wyo.1978).

While the *Gray* case involved a situation in which the unrefuted evidence supported the finding of fact by the trial court, the accurately stated principle is not limited to such situations. It must be invoked here

because the only evidence addressing Reno's intent as to its possession is contrary to the finding of the trial court that the possession was hostile so far as the land in Section 27 is concerned.

Beyond the application of that principle, *Gray*, which disposes of the dispute over the land in Section 27 (*Meyer v. Ellis*, 411 P.2d 338 (Wyo.1966)), charts the course for the further disposition of this case. None of the deeds to Reno describe any of the disputed land and, consequently, the color of title prong of the alternative last element of adverse possession is not available. The enclosure of the other lands by fencing, coupled with the long period of exclusive use by Reno, justifies a presumption that Reno's possession was hostile and under a claim of right. The effect of that presumption is that it is incumbent upon Turner to produce evidence contrary to the presumption, which may be found in Turner's general statements about Reno's permission to locate the fences. If that is sufficient to overcome the presumption, then the burden clearly is upon Reno to establish by its evidence that its possession of the other lands was hostile and under a claim of right.

We acknowledge other Wyoming cases in which the enclosure of lands by a fence coupled with a long period of grazing use, when grazing was the appropriate utilization of the land, can support a determination of title by adverse possession. E.g., *Near v. Casto*, 613 P.2d 577 (Wyo.1980); *Shores*, 591 P.2d 895; *Meyer*. In other cases, however, the constructed fence has been perceived as simply a convenient separation of pasturing land. *Sowerwine v. Nielson*, 671 P.2d 295 (Wyo.1983); *State v. Vanderkoppel*, 45 Wyo. 432, 19 P.2d 955 (1933); *Sturm*. As the court said in *Sturm*, 273 P. at 913:

"* * * Now there are undoubtedly cases when a man has taken possession of a strip of land of his neighbor by mistake, when he does not have any intent to claim ownership thereof. In case of wild prairie land, for instance, we can readily see that a man, in order to make an enclosure for his cattle, and with that as his main purpose in mind, might put up a

fence on what he conceives to be the approximate line of his land, without intending definitely to fix that as a line."

■ With respect to the remaining lands, the applicable rules were summarized in *Ferguson*, 739 P.2d at 757, as follows:

"In order to establish a claim of adverse possession, the claimant must demonstrate 'actual, open, notorious, exclusive, and continuous possession of another's real property for the statutory period, which possession is hostile and under a claim of right or color of title.' *Farella v. Rumney*, Wyo., 649 P.2d 185, 186 (1982); *Shores v. Lindsey*, Wyo., 591 P.2d 895 (1979); *City of Rock Springs v. Sturm*, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1 (1929). In addition, we have said that an intent to assert an adverse claim is necessary to establish title by adverse possession. *Gray v. Fitzhugh*, Wyo., 576 P.2d 88 (1978); *Bryant v. Cadle*, 18 Wyo. 64, 104 P. 23 (1909), reh. denied 18 Wyo. 95, 106 P. 687 (1910). The intent to assert an adverse claim must be established by objective evidence, that is there must be objective indications of an intent to adversely possess the land of another. Testimony as to the claimant's subjective intent does not suffice. *City of Rock Springs v. Sturm*, supra."

We have held that the character of possession of land is ascertained better by acts consistent with a claim of possession than the words of the claimant. *Rutar Farms & Livestock, Inc. v. Fuss*, Wyo., 651 P.2d 1129 (Wyo.1982); *Shores; Sturm*. The objective indications present in this case which evidence adverse possession of the lands other than those in Section 27 are the construction and maintenance of a fence together with the continuous use of the land up to the fence line for grazing livestock. That evidence may be sufficient for the trial court, following remand, to find that the land in Section 33 has been adversely possessed. The court must weigh against that the uncontroverted evidence that taxes were paid by Turner and Turner's testimony that Reno had agreed to the relocation of the fences.

■ In this latter regard, it is important to note that Reno's predecessors in interest may have acquired title by adverse possession prior to the conveyance to Reno. *Meyer*, 411 P.2d 338. In those circumstances, any statements by Mathew Reno with respect to such lands well might be ineffective because they would be entitled to little, if any, weight with respect to the acquisition of title by adverse possession on the part of Reno's predecessors in interest. The same thing cannot be said with respect to the land in Section 27 because, as the trial court found, Reno began leasing the east half of that section as early as 1927. The record does not establish what the situation was prior to that time, or even that the lessor owned the land for ten years prior to 1927. However, Reno's statements with respect to the consensual use would, in our judgment, reach back to the time when Reno's use was commenced. Consequently, the record did not satisfy any possibility of title to the land in Section 27 having been obtained by adverse possession by Reno's predecessors in interest. An owner of land can acquire title through adverse possession of adjacent land by his lessee, but the owner is bound by the nature of the lessee's possession. See *Bruch v. Benedict*, 62 Wyo. 213, 165 P.2d 561 (1946). Cf. *Snell v. Ruppert*, 582 P.2d 916 (Wyo.1978). See also cases cited in 3 Am. Jur.2d *Adverse Possession* § 25 (1986).

■ The doctrine of adverse possession has never been intended to permit the acquisition of title to another person's land under the guise of permissive use. *Rutar*, 651 P.2d 1129; *Meyer*. In an instance such as this, in which the evidence indicates that the true boundaries could easily be identified, coupled with the admissions consistent with *Gray*, 576 P.2d 88, so far as the lands in Section 27 are concerned, no finding of hostile possession under a claim of right can be justified.

The decision of the trial court quieting title to the disputed lands in Section 27 and awarding damages for trespass is reversed. The decision of the trial court quieting title to the disputed lands in Section 33 and awarding damages for trespass with respect to those lands is reversed and remanded for further proceedings in accordance with this opinion.

## APPENDIX A