2017 WY 146

**Howard L. WHITE and Joslyn R. White, Appellants (Plaintiffs),**

**v.**

**Heath S. WHEELER and Tanya D. Wheeler, Appellees (Defendants).**

**S-17-0115**

Supreme Court of Wyoming.

December 14, 2017

Representing Appellants: John D. Rawls, Attorney at Law, Laramie, Wyoming

Representing Appellees: M. Gregory Weisz of Pence and MacMillan LLC, Laramie, Wyoming

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] Heath and Tanya Wheeler (the Wheelers) and Howard and Joslyn White (the Whites) are record owners of adjacent properties in Albany County, south of Laramie, Wyoming. The Whites filed a complaint against the Wheelers asserting a claim for adverse possession based on the Whites' fencing and grazing of livestock on an approximately eight-acre strip of the Wheeler property. On cross-motions for summary judgment, the district court entered summary judgment in favor of the Wheelers, and the Whites appeal. Because genuine issues of material fact precluded summary judgment in favor of either party, we conclude the court erred in granting the Wheeler motion. We therefore reverse and remand for proceedings consistent with this opinion.

## ISSUE

[¶2] The Whites present a single issue on appeal, which they state as:

> Should this Court, after conducting a *de novo* review, reverse the granting of summary judgment in favor of Appellees and remand for further proceedings?

[¶3] Although the Whites frame the issue on appeal as a single question, they claim and argue two errors: 1) that the district court erred in denying them partial summary judgment on their *prima facie* adverse possession claim; and 2) that the court erred in granting Wheelers summary judgment. We therefore restate the issues as:

> 1. Did the district court err in denying the Whites' motion for summary judgment on their *prima facie* adverse possession claim?
>
> 2. Did the district court err in granting summary judgment to the Wheelers on the Whites' *prima facie* adverse possession claim and on the Wheelers'. claim that the Whites' use of the Wheeler property was permissive?

## FACTS

[¶4] In December 1987, Howard and Joslyn White purchased the SW ¼ of Section 27, Township 15 North, Range 73 West, 6th P.M., Albany County, Wyoming (hereinafter Section 27). In the spring of 1988, the Whites built a fence along their property's north property line. The fence (hereinafter the 1988 fence) ran in a straight line starting at the western edge of the property and continued for some distance along the property's northern boundary line. Later in 1988, the Whites moved a manufactured home and utility building onto their Section 27 property, and to protect those buildings from their own grazing livestock, they built an additional "compound fence."

[¶5] About seven years later, in August 1995, the Whites purchased the NW ¼ of Section 27. After that purchase, the Whites owned the entire W ½ of Section 27, and the 1988 fence ceased being a boundary fence. About a year later, in September 1996, the Whites purchased the E ½ of Section 27, which left them with ownership of Section 27 in its entirety. Less than a year later, in July 1997, the Whites platted Section 27 into sixteen tracts and created what is now known as the White Tracts.

[¶6] The Whites platted the tracts and drew the tract boundaries in such a manner that their home and utility building ended up in Tract 16 and the 1988 fence ended up in Tract 10 (and partially in Tract 12 to the east of Tract 10). The map below shows the White Tracts and the platted boundary lines for the sixteen tracts. The 1988 fence crosses Tract 10 from west to east at the northern boundary line of Section 27's SW ¼.

[¶7] The Whites retained Tract 16 and have been that tract's only owners since they platted the White Tracts. The Whites also retained Tract 10 for a number of years, until December 29, 2005, when they conveyed it by warranty deed to Jeffrey and Lynette Mor-

ris. Tract 10 thereafter changed hands two more times. On October 6, 2011, the Morrises conveyed Tract 10 by warranty deed to Michael and Kathleen Selmer and Siddhartha and Carrie Murthy. The Selmers/Murthys then conveyed the property by warranty deed to Heath and Tanya Wheeler (the Wheelers) on January 9, 2013. The Wheelers remain the present owners of Tract 10, and the 1988 fence remains in Tract 10.

[¶8] The present dispute between the Whites and the Wheelers began in the spring of 2016 when Joslyn White found that horse manure had been dumped along the south side of the 1988 fence, and that a gate at the west end of the fence had not been properly closed. In response to those discoveries, Ms. White placed chains and padlocks on the west gate on May 31, 2016.

[¶9] On June 2, 2016, Heath Wheeler visited the White residence on Tract 16 and informed Ms. White that he had staked the property line between Tracts 10 and 16 and planned to construct a fence on the true property line. On June 3, 2016, a letter from the Whites' attorney objecting to the Wheelers' plan to construct a new fence was hand-delivered to the Wheelers. Attorneys for both parties exchanged letters over the next several weeks, but the parties were unable to resolve their disagreement over the Wheelers' proposed fence.

[¶10] On August 17, 2016, the Whites filed a complaint against the Wheelers seeking to quiet title to the approximately eight-acre portion of Tract 10 that lies between the 1988 fence and the northern boundary of Tract 16 in district court. The complaint asserted three causes of action: 1) adverse possession based on the Whites' fencing of the property and grazing of livestock on the property; 2) recognition and acquiescence, alleging the Wheelers and their predecessors recognized the 1988 fence as the true property boundary and acquiesced in that boundary; and 3) ejectment. On August 30, 2016, the Wheelers filed their answer, which included affirmative defenses.

[¶11] The Whites filed a motion for summary judgment or partial summary judgment on February 2, 2017. On February 21, 2017, the Wheelers filed an opposition to the Whites' motion. With respect to the Whites' adverse possession claim, the Wheelers asserted the Whites' supporting affidavits made "only broad, unspecified and conclusory assertions of ultimate fact," and were insufficient to support a *prima facie* showing of adverse possession. They further asserted that genuine issues of material fact precluded summary judgment, pointing to affidavits submitted in opposition to the Whites' motion. Finally, the Wheelers requested that the district court enter summary judgment in their favor, asserting that the Whites' use of the disputed property was permissive and that they failed to show hostility in their use of the property.

[¶12] On March 6, 2017, the Whites filed a reply in support of their summary judgment motion, together with rebuttal affidavits. On March 10, 2017, the district court entered an order denying the Whites' motion for summary judgment and granting summary judgment in favor of the Wheelers. The court explained, in part:

29. Until 2016, there was no hostility regarding the disputed strip of land. The Whites utilized the disputed strip of land for grazing; the Wheelers (and their predecessors) knew of this innocuous use, and had no objections thereto. They simply were being good neighbors. There was no indication, until the 2016 dispute arose, that the Whites intended to deprive the Wheelers permanently of their ownership of this acreage. No flag was unfurled indicating an invasion was at hand. Once some indicia of hostility and notoriety arose, the Wheelers took action to preserve their ownership, leading to this litigation.

30. The Whites have failed to set forth a *prima facie* case that they used the disputed strip of land on Tract 10 in an open, hostile, notorious, exclusive, and continuous manner, under claim of right or color of title, for ten years or more.

31. Judgment as a matter of law, in favor of [Wheelers], is warranted, as to the claim of adverse possession. As a result, summary judgment also is warranted, in favor of the Wheelers, with regard to the Whites' claim for Recovery of Realty (Ejectment).

[¶13] On April 7, 2017, the Whites filed their timely notice of appeal to this Court.[1]

## STANDARD OF REVIEW

[¶14] When, as here, a case is fully resolved by the grant and denial of cross-motions for summary judgment, "both the grant and the denial of the motions for a summary judgment are subject to appeal." *Hurst v. Metro. Prop. and Cas. Ins. Co.*, 2017 WY 104, ¶ 8, 401 P.3d 891, 895 (Wyo. 2017) (quoting *Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo. 2011)).[2] Our review is as follows:

> We review a district court's order granting summary judgment *de novo* and afford no deference to the district court's ruling. *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016). This Court reviews the same materials and uses the same legal standard as the district court. *Id.* The record is assessed from the vantage point most favorable to the party opposing the motion ..., and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.*

*The Tavern, LLC v. Town of Alpine*, 2017 WY 56, ¶ 46, 395 P.3d 167, 178-79 (Wyo. 2017).

[¶15] Additionally, with respect to adverse possession claims in particular, we have recognized they are "peculiarly factual in na-ture," and that because they are so fact-sensitive, "appellate review of a grant of summary judgment is subject to more exacting scrutiny." *Braunstein v. Robinson Family Ltd. P'ship*, 2010 WY 26, ¶ 19, 226 P.3d 826, 835 (Wyo. 2010).

## DISCUSSION

[¶16] We begin our review with a brief discussion of adverse possession generally, including the elements of a claimant's *prima facie* claim and the shifting burdens of proof called for by our law. We will then turn to the Whites' claim that the district court erred in denying them partial summary judgment on their *prima facie* claim. Last, we will address the Whites' assertion that the court erred in granting summary judgment to the Wheelers on the Whites' *prima facie* claim and on the Wheelers' permissive use claim.

## I. Adverse Possession Elements and Presumptions

[¶17] Adverse possession claims are not favored in the law, *Braunstein*, ¶ 19, 226 P.3d at 836, and "a presumption in favor of the record title holder exists, unless and until the adverse claimant makes out his *prima facie* case." *Hillard v. Marshall*, 888 P.2d 1255, 1259 (Wyo. 1995). The elements an adverse possession claimant must prove to make the required *prima facie* showing are well established in our precedent.

> One claiming that he has adversely possessed the land of another for the ten-year

---

1. The district court also granted the Wheelers summary judgment on the Whites' claim for recognition and acquiescence. The Whites do not, however, present argument on that ruling on appeal, and we therefore summarily affirm that aspect of the court's ruling. *See Woods v. State*, 2017 WY 111, ¶ 18, 401 P.3d 962, 969 (Wyo. 2017) (quoting *Snyder v. State*, 2015 WY 91, ¶ 15 n.1, 353 P.3d 693, 695 n.1 (Wyo. 2015)) ("Court will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation."). The Wheelers likewise did not argue on appeal that the Whites were estopped by a deed granting their predecessors in interest property to the survey line, and we will therefore not address that issue, either. We note in passing that estoppel by deed has generally been held not to apply to prevent a grantor from adversely pos-sessing land he has granted. *Torgerson v. Rose*, 339 N.W.2d 79, 83 (N.D. 1983); 28 Am. Jur. 2d *Estoppel and Waiver* § 12 (2011, database updated Nov. 2017).

2. The Wheelers did not file a separate cross-motion for summary judgment, but in responding to the White motion, they requested entry of summary judgment in their favor. A court may grant summary judgment even to a non-moving party if the record supports doing so. *Pennaco Energy, Inc. v. Sorenson*, 2016 WY 34, ¶ 24 n.11, 371 P.3d 120, 125 n.11 (Wyo. 2016); *Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp.*, 2015 WY 22, ¶ 20 n.11, 343 P.3d 783, 789 n.11 (Wyo. 2015); *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987); *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1064 (Wyo. 1986).

period set out in Wyo. Stat. Ann. § 1-3-103 (LexisNexis 2015) must show that his use of the land was actual, open, notorious, exclusive, and continuous, and that it was hostile and pursuant to a claim of right or color of title. *Hillard v. Marshall*, 888 P.2d 1255, 1258 (Wyo. 1995); *Turner v. Floyd C. Reno & Sons, Inc.*, 769 P.2d 364, 368 (Wyo. 1989). A hostile possession or use is one that amounts to an assertion of ownership adverse to that of the record owner. It must be so incompatible with or so in defiance of the rights of the true owner that an ordinarily prudent owner would be on clear notice that his ownership is in jeopardy, that the claimant *intends* to possess the property as his own, and that the owner should take some action to protect his title. *Graybill* [*v. Lampman*, 2014 WY 100,] ¶ 36, 332 P.3d [511] at 522 [ (Wyo. 2014) ].

*Galiher v. Johnson*, 2017 WY 31, ¶ 20, 391 P.3d 1101, 1106 (Wyo. 2017) (emphasis in original).

[¶18] Once an adverse possession claimant makes the required *prima facie* showing, the presumption shifts to one in favor of the adverse possession claimant.

When there is no clear showing to the contrary, a person who has occupied the land for the statutory period, in a manner plainly indicating that he has acted as the owner thereof, is entitled to a presumption of adverse possession; and the burden shifts to the opposing party to explain such possession. However, if a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession.

*Osuch v. Gunnels*, 2017 WY 49, ¶ 10, 393 P.3d 898, 901 (Wyo. 2017) (quoting *Helm v. Clark*, 2010 WY 168, ¶ 8, 244 P.3d 1052, 1057 (Wyo. 2010)).

## II. Whites' Partial Summary Judgment Claim

[¶19] The Whites contend that no genuine issues of material fact exist on their *prima facie* adverse possession claim, and that the district court thus erred in denying them partial summary judgment on that claim. In particular, the Whites assert they were required to show no more than that they enclosed the disputed land with a fence and grazed livestock on the land to establish a presumption of adverse possession. We disagree and find no error in the district court's denial of the Whites' motion.

[¶20] "[E]nclosing land in a fence may be sufficient to 'raise the flag' of an adverse claim, and '[t]he pasturing of animals within a substantial enclosure is sufficient to establish the elements of adverse possession.'" *Helm*, ¶ 10, 244 P.3d at 1058 (quoting *Hillard*, 888 P.2d at 1259). Our Court has recognized, however, that "mere possession is not a sufficient basis for claim of title by adverse possession." *Rutar Farms & Livestock, Inc. v. Fuss*, 651 P.2d 1129, 1134 (Wyo. 1982) (quoting 3 Am. Jur. 2d *Adverse Possession* § 12 (1962)). An adverse possession claimant must not only raise the flag of adverse possession, but must "keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest." *Wyo-Ben, Inc. v. Van Fleet*, 2015 WY 146, ¶ 22, 361 P.3d 852, 859 (Wyo. 2015) (quoting *Ruby River Canyon Ranch, Ltd. v. Flynn*, 2015 WY 74, ¶ 10, 350 P.3d 748, 752 (Wyo. 2015)).

[¶21] In other words, an adverse possession claimant whose claim is based on fencing and grazing of the disputed property must still establish that his use of the property was open, notorious, exclusive, continuous, and hostile. *Hillard*, 888 P.2d at 1258; *Rutar*, 651 P.2d at 1133. The question on review then is whether the Whites, as the summary judgment movants, established that no genuine issues of material fact existed with respect to this required showing.

### A. Whites' Showing on Continuous and Exclusive Possession

[¶22] In the case of a grazing-based adverse possession claim, the claimant may establish continuous possession by showing that land suitable for grazing was "occupied and used for that purpose in each year during the full period of the growing season." *Shores v. Lindsey*, 591 P.2d 895, 902 (Wyo. 1979). We have explained:

A person who rests his claim of adverse possession on the grazing of livestock on the land in question is not required to

continuously pasture the herd throughout the entire year. Continuous dominion and control is proven when land suitable for grazing and pasturage is occupied and used in such manner during the full period of the growing season.

*Shores*, 591 P.2d at 900 (citations omitted); *see also Davis v. Chadwick*, 2002 WY 157, ¶ 11, 55 P.3d 1267, 1271 (Wyo. 2002).

 [¶23] As to the element of exclusive possession, we have said that " 'exclusive' for purposes of adverse possession does not mean absolutely exclusive, but only such use as would be expected of an owner under the circumstances." *Graybill v. Lampman*, 2014 WY 100, ¶ 33, 332 P.3d 511, 521 (Wyo. 2014). For this element, we must consider the presence on the disputed property of individuals other than the adverse claimant and the significance of that presence in relation to the claimant's exclusive dominion over the property. *See Cook v. Eddy*, 2008 WY 111, ¶ 25, 193 P.3d 705, 713 (Wyo. 2008) (upholding finding of exclusive possession where record title holder failed to conduct any activities of significance on the property).

 [¶24] The Whites supported their summary judgment motion with the affidavits of Howard and Joslyn White and their sons, Rives White and Jacques White.[3] With regard to the facts relevant to the Whites' *prima facie* claim, each of these affidavits alleged essentially the same facts, so we will use Howard White's affidavit as our reference.

[¶25] On the showing of continuous and exclusive possession, Howard White attested:

p. After selling Tract 10, my family and our tenants, continued to graze our livestock right up to the fence that I built in the Spring of 1988.

q. To my knowledge, no owner of Tract 10 or anyone else (other than my family and our tenants) has grazed livestock on that part of Tract 10 south and west of that fence since I first built it.

r. To my knowledge, no owner of Tract 10 or anyone else (other than my family and our tenants) has occupied or used that part of Tract 10 south and west of that fence since I first built it.

s. That fence has never been moved from its original location.

* * *

aa. Ever since we sold Tract 10, at least until this controversy started last June, that fence has kept the owners of Tract 10 from grazing their livestock on that part of Tract 10 south and west of the fence that I built in the Spring of 1988.

[¶26] We can find no error in the district court's rejection of this evidence as a basis for summary judgment. First, the statements lack sufficient specificity as to when and how often the Whites' grazed livestock on the property and how they maintained exclusive possession of the property. In rejecting similar evidence in support of a summary judgment motion, we have explained:

There are no specific facts explaining and describing in what ways the affiant or his family members did not allow anyone else to use the disputed property—what did they do and when. With respect to grazing livestock, there are no specific facts concerning the type and number of livestock, whether that livestock was placed on the Robinson family ranch lands and allowed to roam and stray freely onto the disputed property or whether that livestock was intentionally driven to, placed on, and purposely kept on the disputed property. There are no specific facts stating whether the grazing livestock were purposely placed on the disputed property each year during the full period of the growing season.

*Braunstein*, ¶ 23, 226 P.3d at 838.

[¶27] Moreover, in addition to the fact that the evidence lacks the required specificity to establish continuous and exclusive use as a matter of law, the Wheelers submitted opposition affidavits directly refuting the White affidavits. Those affidavits included affidavits by Heath Wheeler, Tanya Wheeler, and Michael Selmer. As to the facts relevant to the Whites' *prima facie* claim, the Wheeler affi-

---

3. The Whites also submitted an affidavit from their tenant, George Howard, but that affidavit is of marginal relevance. Mr. Howard attested only that he rented the White property in or around 2003 for about two and one-half years and that he "used the property to run calves across it."

davits alleged essentially the same facts, so we will use Heath Wheeler's affidavit as our reference. He attested:

6. After we purchased Tract 10, my wife and I immediately took possession of the property and moved ourselves and our two children into the house located on the property.

\* \* \*

8. As we took possession of Tract 10, we immediately made use of all portions of the Tract, including but not limited to the land located to the south of the pasture fence. We have used the land located to the south of the fence on a regular basis since we first purchased Tract 10 in January 2013, continuing through [the] present day.

\* \* \*

11. We have used the land located to the south of the Pasture Fence for recreational purposes such as walking, horseback riding, and riding of an all-terrain vehicle. We have also used the land located to the south of the Pasture Fence to spread manure from our horses, among other activities.

\* \* \*

15. There is a gate located on the Pasture Fence in the southwest corner of that fence between the southerly portion of Tract 10 and the rest of Tract 10. From the date that we took possession of Tract 10 in January 2013 until June 2016, that gate has always been free from any lock and chain. We routinely used that wire gate to enter into and use the southerly part of Tract 10 located to the south of the Pasture Fence.

\* \* \*

24. After my wife and I acquired Tract 10 in January 2013, we have been able to observe any use of the portion of Tract 10 located on the south side of the Pasture Fence.

\* \* \*

31. During the fall, winter and spring seasons commencing in January 2013 until present date, there have been no horses or other livestock present on the now-disputed land during these three seasons.

32. On a few scattered occasions of the summers of 2013-2015, there were a few horses present on Tract 16. Only on rare occasion have my wife and I seen horses present on the southerly portion of Tract 10 on the south side of the Pasture Fence. The grazing of horses on the land in question was so infrequent that the horses were not present on even a seasonal basis. This use was so sporadic and infrequent that it did not affect our use and enjoyment of that part of Tract 10 in any way.

\* \* \*

49. During the entire time my wife and I have owned Tract 10, we have used and possessed the disputed piece of land, and no one else ever possessed that land. On the few occasions when we observed horses in the disputed areas, it appeared to us that the horses were simply grazing on open range, and casually traveled back and forth between the disputed land and Tract 16 to the south. There has absolutely been no occasion when anyone purposely ran the horses onto the disputed tract of land, and we have never observed any person attempt to keep horses on that land by patrolling or use of dogs. Nor have we ever seen any effort carried out by anyone that could be considered an attempt to lure onto or keep horses on that land such as placement of salt, placement of minerals, placement of feed tubs, placement of water troughs, placement of hay or placement of other feed.

[¶28] Michael Selmer attested, in relevant part:

8. . . . While my family and I owned Tract 10, we used the land located to the south of the Pasture Fence for recreational purposes such as walking, running, and riding an all-terrain vehicle. We used the land in question from the time we acquired Tract 10 until we sold in January 2013 to Mr. and Mrs. Wheeler.

\* \* \*

13. There was a gate located on the Pasture Fence in the southwest corner of that fence between the southerly portion of Tract 10 and the rest of Tract 10. The gate allowed us to access the southern portion of Tract 10 on the south side of the Pasture Fence, and we used that gate.

\* \* \*

22. On a few occasions, my family and I did see some horses on the southerly portion of Tract 10 to the south of the Pasture Fence.

23. On those few occasions when we observed horses grazing on the disputed area of Tract 10, such use was in no way ever such that it could have been considered to be notorious, hostile, exclusive, significant or continuous. My family and I always allowed such use as an accommodation to neighbors.

[¶29] The Whites filed rebuttal affidavits responding to the statements in the Wheeler and Selmer affidavits, and those rebuttal affidavits did provide additional detail on the Whites' grazing activities. Nonetheless, when we view the evidence in the light most favorable to the Wheelers, as we must when considering the Whites' motion, the evidence reflects a clear dispute of material fact on the question of the Whites' continuous and exclusive use of the disputed property. The rebuttal affidavits may have added additional detail on that use, but they did not resolve the disputed questions of material fact. The district court thus properly denied the Whites summary judgment on these adverse possession elements.

## B. Whites' Evidence on Open, Notorious, and Hostile Possession

[¶30] The requirement that an adverse claimant's possession be open, notorious, and hostile is aimed at putting the property's record owner on notice of the adverse claim. Generally, open and notorious possession requires "actions of the claimant [that] openly and overtly demonstrate control or use that is consistent with the type of land in dispute." *Graybill*, ¶ 30, 332 P.3d at 520. The element of hostility does not require a showing of ill will, but rather is "an assertion of ownership adverse to that of the record owner." *Id.*, ¶ 36, 332 P.3d at 522.

[¶31] In certain cases, a heightened showing is required to establish open, notorious, and hostile possession.

This Court has held that "[a] permissive user may change his possession into adverse title with a clear, positive, and continuous disclaimer and disavowal of the title of the true owner brought home to the latter's knowledge." *Hutchinson v. Taft*, 2010 WY 5, ¶ 19, 222 P.3d 1250, 1254 (Wyo. 2010). "There must be either actual notice of the hostile claim or acts or declarations of hostility so manifest and notorious that actual notice will be presumed in order to change a permissive or otherwise non-hostile possession into one that is hostile." *Id.* (quoting *Kimball v. Turner*, 993 P.2d 303, 306 (Wyo. 1999)). As one commentator has observed, "[i]f possession is permissive in the beginning, it can be changed to one of hostility only by the most unequivocal conduct on the part of the adverse claimant." 10 David A. Thomas, *Thompson on Real Property* § 87.10, at 148-49 (3d ed. 2013). *Wyo-Ben*, ¶ 27, 361 P.3d at 859-60.

[¶32] In this case, the Whites assert a change in the character of the 1988 fence that makes this heightened standard applicable. When the Whites owned both Tracts 10 and 16, the 1988 fence was plainly not a boundary fence, and the Whites do not contend otherwise. Instead, the Whites contend that just as soon as they sold Tract 10 to the Morrises, they began to treat the 1988 fence as a boundary fence and the enclosed portion of Tract 10 as their own. We therefore review their evidence on summary judgment against the heightened standard.

[¶33] Relevant to the Whites' claim of open, notorious, and hostile possession, Howard White attested:

w. Without the fence that I built in the Spring of 1988, the entire pastureland between our house and the Wheelers' house would be open range with nothing to keep our livestock from grazing right up to their doorstep or their livestock from grazing right up to our compound's fence.

x. Until this controversy started last June, we and all the owners of Tract 10 have let the disputed fence act as the boundary between the two properties.

y. That fence is out in the open by itself and clearly visible from the house on Tract 10.

[¶34] As to paragraph "y," visibility of the fence alone does not establish the required showing of open, notorious, and hostile possession. An adverse claimant must show not only a fence but that his use of the

fenced land was such that it put the record owner on notice of the adverse claim. *Rutar*, 651 P.2d at 1184. As we discussed earlier, the extent of the Whites' grazing activities is a disputed issue of fact.

[¶35] Paragraph "x" get the Whites no closer to their required showing. It contains no specific facts describing how prior Tract 10 owners indicated their alleged agreement to treat the fence as a boundary fence and is no more than a conclusory allegation. *See Braunstein*, ¶ 14, 226 P.3d at 832 (affidavit in support of summary judgment must state specific facts rather than conclusory assertions). Additionally, it was directly refuted by the affidavit of Michael Selmer, who attested that during his family's ownership of Tract 10, they understood the location of the true boundary and they considered the fence to be a pasture fence, not a boundary fence.

[¶36] Paragraph "w," which describes the open range between Tracts 10 and 16, likewise fails to make the required showing on summary judgment. The Whites argue for an inference to be drawn from the presence of the 1988 fence in what would otherwise be open space. They contend the 1988 fence serves to fence out the neighbors' livestock, which they argue is an open and notorious act of ownership hostile to the rights of the Tract 10 owners. In the context of summary judgment, Whites' proffered inference must be rejected.

[¶37] If multiple reasonable inferences may be drawn from a particular fact, that fact is not a basis for summary judgment. *Amos v. Lincoln Cty. Sch. Dist. No. 2*, 2015 WY 115, ¶ 21, 359 P.3d 954, 960 (Wyo.

2015); *Bettencourt v. Pride Well Serv., Inc.*, 735 P.2d 722, 726 (Wyo. 1987) (issue should be submitted to fact-finder if reasonable minds could reach different conclusions and inferences from facts). The inference offered by Whites is indeed one that might be drawn from the continued presence of the 1988 fence. An alternative inference might be that the Tract 10 owners permitted the fence to remain because it did not interfere with their own use of Tract 10 and served to protect their property from the Whites' livestock. Given these multiple inferences, the significance of the 1988 fence's continued presence must be sorted out by a fact-finder at trial, not by a summary judgment ruling.[4]

[¶38] The evidence on the Whites' *prima facie* adverse possession claim is clearly disputed, and the district court thus did not err in denying summary judgment to the Whites on any part of their required showing.

## III. Wheelers' Summary Judgment Motion

[¶39] Having completed our review of the district court's denial of summary judgment to the Whites, we now turn to the court's grant of summary judgment to the Wheelers. In doing so, we also change the lens of our review. Because we are now concerned with the Wheelers' cross-motion for summary judgment, our review is flipped. We must view the evidence from the vantage point most favorable to the Whites, the parties opposing the Wheeler motion, and it is the Whites who are entitled to the benefit of all favorable inferences that may fairly be drawn from the evidence. *Tavern*, ¶ 46, 395 P.3d at 178-79.[5]

---

4. Even if it were proper to draw any inferences from the continued presence of the 1988 fence, on Whites' summary judgment motion, it would be the Wheelers who are entitled to all favorable inferences that may fairly be drawn from the evidence. *Tavern*, ¶ 46, 395 P.3d at 178-79.

5. This same shift should have occurred in the district court's analysis of the Wheelers' cross-motion, with the Wheeler motion being considered independently of the White motion. As one authority explains:

> The third reason that cross-motions must be considered separately and should not be interpreted necessarily to mean that judgment should be entered on one of them is that each party, as a movant for summary judgment, bears the burden of establishing that no genu-

ine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion. The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard. Both motions must be denied if the court finds that there is a genuine dispute of material fact. But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

[¶40] Using this standard for our review, we will address first the district court's entry of summary judgment in favor of the Wheelers on the Whites' *prima facie* adverse possession claim. We will then address the court's entry of summary judgment in favor of the Wheelers on their claim that the Whites' use of the disputed property was permissive.

## A. Summary Judgment on Whites' *Prima Facie* Claim

## 1. Open, Notorious, and Hostile Possession

■■■ [¶41] In granting the Wheelers summary judgment, the district court concluded as follows concerning the requirement of open, notorious, and hostile possession:

> 26. Under these circumstances, there was no use, prior to 2016, so hostile as to put the Wheelers, or their predecessors, on notice of a claim of adverse possession. There were no noticeable changes made to the land; no signs of use; and no hallmarks of trespassing. Prior to 2016, there is no evidence that the Whites exercised dominance or exclusive control over this strip of land or, in fact, any use of the land in a continuous manner. They did not pay taxes on this disputed strip; they did not execute documents of title; they did not make statements to anyone claiming the disputed property as their own. ...
>
> * * *
>
> 29. Until 2016, there was no hostility regarding the disputed strip of land. The Whites utilized the disputed strip of land for grazing; the Wheelers (and their predecessors) knew of this innocuous use, and had no objection thereto. They simply were being good neighbors. There was no indication, until the 2016 dispute arose, that the Whites intended to deprive the Wheelers permanently of their ownership of this acreage. No flag was unfurled indicating an invasion was at hand. Once some indicia of hostility and notoriety arose, the Wheelers took action to preserve their ownership, leading to this litigation.

10A Charles A. Wright et al., *Federal Practice & Procedure Civil* § 2720 (4th ed. database updated

[¶42] The record does not support this conclusion. First, our law is clear that "enclosing land in a fence may be sufficient to 'raise the flag' of an adverse claim." *Helm*, ¶ 10, 244 P.3d at 1058 (quoting *Hillard*, 888 P.2d at 1259). The evidence is undisputed that the Whites enclosed the disputed property with a fence, and as the nonmoving party on Wheeler's request for summary judgment, they were entitled to any reasonable inference that could be drawn from that evidence. The Whites were therefore entitled to the inference that in fencing the disputed property, they raised the flag of their adverse claim.

[¶43] As to whether the Whites' use of the disputed property was sufficiently open, notorious, or hostile to support their adverse claim, we do recognize the difficulty of the Whites' heightened showing. Nonetheless, when we view the evidence in the light most favorable to them, we must again find the disputed facts preclude the district court's ruling on this required element.

[¶44] The Whites and their two sons attested that they have inspected, repaired, and maintained the 1988 fence at least annually since its construction. Additionally, as discussed above, multiple inferences may be drawn from the continued presence of the 1988 fence, including that it acted to keep the Wheeler livestock off the disputed property, and was thus an assertion of ownership through fencing out. *See Braunstein*, ¶ 18, 226 P.3d at 834-35 (recognizing Wyoming as a fence-out state). The existence of these multiple inferences again makes the Whites' claim of open, notorious, and hostile possession one to be decided by a trier of fact, not by summary judgment.

[¶45] Finally, we note that while a claimant's failure to pay taxes on or execute title documents affecting the disputed property may be factors that weigh against an adverse possession claim, they are not determinative. We have explained:

> [A]s the district court recognized, the fact that Mr. Clark had not paid taxes on the property is typical when a case involves

April 2017) (footnotes omitted).

use to a fence line. *See, e.g., Cook,* ¶ 22, 193 P.3d at 712; *Doenz v. Garber,* 665 P.2d 932, 937 (Wyo. 1983). The claimant's failure to execute title instruments affecting the disputed property also is not unusual in fence line adverse possession cases. *Id.* Although these facts weigh against a finding of adverse possession, they are not necessarily determinative. *Id.*

*Helm,* ¶ 9, 244 P.3d at 1057.

[¶46] Given the disputed issues of fact on the question of the Whites' open, notorious, and hostile possession, the Wheelers were not entitled to summary judgment on these adverse possession elements.

## 2. Continuous and Exclusive Possession

[¶47] With respect to the elements of continuous and exclusive possession, the district court found as follows in granting the Wheelers summary judgment:

23. Even relying heavily on the *Affidavits* and *Rebuttal Affidavits* presented by the Whites, their claims for adverse possession are lacking. The grand-sum of their "adverse" actions are claims to continuous grazing of 6-8 horses for approximately six months of each year, and perhaps some other livestock at times. This grazing occurred on the *entirety* of the Whites' property, a small portion of which would have involved the disputed strip of land. Accordingly, the actual use of the disputed strip of land was sporadic, at best. ....

\* \* \*

27. Additionally, the Whites' use of the disputed strip of land was nowhere near exclusive. There is ample, undisputed evidence supporting the conclusion the Wheelers, the Whites, the Selmers, and others openly used the disputed strip of land. Mr. White's claims that he has not witnessed certain uses by others on the disputed strip, *see Rebuttal Affidavit of Howard L. White,* is insufficient to create a genuine issue of material fact regarding whether that use, in fact, occurred.

[¶48] We again find that when the evidence is viewed in the light most favorable to the Whites, the district court's summary judgment ruling on the Whites' continuous and exclusive possession cannot be sustained.

[¶49] The Wheelers' evidence on summary judgment consisted of their own affidavits attesting they had observed only sporadic and infrequent grazing of the Whites' horses on the disputed property, during the summer months only, and Michael Selmer's affidavit attesting that he and his family observed only occasional grazing on the disputed property. In response, the Whites submitted rebuttal affidavits that directly contradicted the Wheeler and Selmer affidavits. For example, Rives White attested that he lived on the White property from August 2006 to May 2013, had horses that entire time, and grazed them up to the disputed fence line. Howard White attested:

28. We lived at the residence from 1987 until fall of 1996. We did move the fall of 1996. The trailer was rented from then until summer of 2006. The grass was leased for livestock grazing during this time frame also. Since August 2006 to July 2016 it has been continuously lived in by one or more members of my family. I lived there from February 2011 to February 2012. My two sons both lived there during their tenure to obtain degrees at UW. My son Rives kept his horses there (including on the disputed part) the whole time he lived there while going to UW. My wife was employed full-time by UW. She and I kept horses on the property (including the disputed part) to use the grass. Laramie has a good climate for livestock grazing as it is cooler and has fewer insects to bother animals. The grass was rotationally grazed using the three pastures, the west pasture (including the disputed part) being one of them. This allowed adequate use of the grass without overgrazing the ground.

\* \* \*

31. We have consistently each year grazed this ground with our horses beginning in the early spring after the snow melts allowing grazing without supplemental feed. We graze through the summer and to late fall until the weather gets cold and snowy. Our horses are then taken to Nebraska and turned out for the winter in a milder climate and where supplemental

feed is less expensive, more readily available and easier to feed.

[¶50] Joslyn White attested:

31. ... The horses grazed that pasture each time we rotated pastures. The timing for rotation depends on the condition of the pasture, the grass, the water, etc., but usually we rotate pastures daily. We even had set water up for the horses to remain in the west pasture (including the disputed area), and not have to be brought back to the east side daily for water. Clearly, the horses were in the west pasture, including the disputed area, almost daily every year between the beginning of April and the end of October.

[¶51] The White affidavits describe a use of the disputed property that was appropriate to its suitability for livestock grazing. *See Shores*, 591 P.2d at 900 ("Continuous dominion and control is proven when land suitable for grazing and pasturage is occupied and used in such manner during the full period of the growing season."). The affidavits thus created a clear issue of disputed fact on the question of the Whites' continuous possession of the disputed property, and the district court's summary judgment finding on that element cannot be sustained.[6]

[¶52] With regard to the element of exclusive possession, the district court concluded "[t]here is ample, undisputed evidence" that "the Wheelers, the Whites, the Selmers, and others openly used the disputed strip of land." The court further concluded that the Whites' evidence was insufficient to create a genuine issue of fact. We again disagree.

[¶53] The Wheelers' evidence on exclusivity consisted of affidavits by both Wheelers and Michael Selmer. The Wheelers attested to using the disputed property for "walking,

horseback riding, and riding of an all-terrain vehicle," and "to spread manure from our horses, among other activities." Mr. Selmer attested to use of the disputed property by him and his family for "walking, running, and riding an all-terrain vehicle." The Whites responded by affidavit, stating they never saw these activities, and they found no manure on the disputed property until May of 2016.

[¶54] The Wheeler evidence did not provide a basis for summary judgment on the question of exclusive possession. First, the evidence did not specify how frequently the Wheelers and Selmers used the disputed property.[7] Again, exclusive possession does not mean absolutely exclusive possession, but instead looks to whether the use by others interferes with the adverse claimant's "exclusive dominion." *Graybill*, ¶ 33, 332 P.3d at 521. Without details on the frequency of the use by the Selmers and Wheelers, we cannot judge its effect on the Whites' claimed dominion.

[¶55] Additionally, the Whites' affidavit statements that they never saw the Selmers or Wheelers using the disputed property are indeed sufficient to create a genuine issue of material fact. A number of reasonable inferences may be drawn from the fact that the Whites did not see the activity. The inference that is favorable to the Whites, and the one to which they are entitled on summary judgment, is that the Selmers' and Wheelers' use of the property either did not occur or was so infrequent as to be inconsequential and easily missed. Given this inference, the Whites' evidence was sufficient to create an issue of disputed fact on the question of their exclusive possession.

---

6. We assume the district court ruled as it did based on a finding that the Wheeler and Selmer affidavits were more credible than the White affidavits. Summary judgment may not, however, be entered based on a credibility determination. *Shafer v. TNT Well Serv., Inc.*, 2012 WY 126, ¶ 14, 285 P.3d 958, 963 (Wyo. 2012). Credibility determinations must be reserved for trial, even if it will be a bench trial, because "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." 10B Charles A. Wright et al., *Federal Practice & Procedure Civil* § 2738 n.42 (4th ed. database

updated April 2017) (quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)).

7. Mr. Selmer's affidavit was silent on the frequency of use. The Wheeler affidavits used only general terms to describe the frequency of their use, asserting they used the property "on a regular basis" and "routinely" used the gate to gain access. Because on summary judgment the Wheelers' evidence must be viewed in a light most favorable to the Whites, we cannot broadly infer a significant level of use based on the terms used in the Wheeler affidavits.

[¶56] When we view the evidence on summary judgment through the proper lens, we can only conclude that genuine issues of material fact exist with respect to the Whites' *prima facie* adverse possession claim. The district court thus erred in granting the Wheelers summary judgment on the claim.

## B. Summary Judgment on Wheelers' Permissive Use Claim

[¶57] The district court granted summary judgment to the Wheelers on their permissive use claim based on findings that: 1) the 1988 fence was a fence of convenience; and 2) the Whites' use of the disputed property "was known of and consented to by the Wheelers and their predecessors-in-interest." As with the Whites' *prima facie* claim, the evidence on the permissive use question is in clear dispute, and the district court's ruling cannot be sustained.

[¶58] With respect to the nature of the 1988 fence, the district court looked to how the fence functioned before the Whites sold Tract 10 in 2005. The court reasoned that because the Whites owned the land on both sides of the fence before the sale of Tract 10, the fence served as a fence of convenience. The court further reasoned that because Tract 10 was sold after the boundaries were established and known, and at a time that all parties understood the fence was not on the boundary line between Tracts 10 and 16, the fence continued after the sale to be no more than a fence of convenience. The flaw in the district court's reasoning is its disregard of what occurred after the 2005 sale of Tract 10.

[¶59] As we indicated in our discussion of the Whites' *prima facie* claim, a use may change from one that is permissive to one that is hostile and adverse. That is what the Whites claim in this case. They assert that after they sold Tract 10 to the Morrises in 2005, they began treating the fence as a boundary fence and using the disputed property in an open and notorious manner that was hostile to the record owner's rights. While the Whites' required showing is a heightened and difficult one, it is also one

that is surrounded by disputed fact, and, in this case, not suited to summary judgment.[8]

[¶60] Disputed questions of fact also require that we reject the district court's finding that the Whites' use of the disputed property was with the consent of the Wheelers and their predecessors-in-interest. On this question, the Wheelers presented evidence of two occasions on which the Wheelers claim the Whites sought permission to use the disputed property to graze their horses. The first occasion was described in Michael Selmer's affidavit. He attested:

> We had little regular communication with Mr. and Mrs. White. However, on one occasion when I was jogging in the area, I encountered a young man near the trailer house on Tract 16. I think the young man I met is a son of Mr. and Mrs. White. The young man mentioned that he was going to put some horses on Tract 16 and that the horses likely would end up grazing on the southerly portion of Tract 10 located to the south of the Pasture Fence. His discussion with me was cordial and was in no way assertive, hostile or adversarial.

[¶61] In response to this evidence, the Whites presented affidavits from their two sons, Rives and Jacques. Rives White attested:

> I do not remember any such discussion with Mr. Selmer. I do not remember ever meeting Mr. Selmer and I could not pick him out of a line-up. From August 2006 to May 2013 I treated the fence as a boundary line. In this make-believe conversation, I would not have use[d] tract numbers because I didn't know the tract numbers. I would not have discussed with someone what I intended to do with my horses on my side of the fence.

[¶62] Jacques White also denied the conversation with Mr. Selmer. He attested:

> 1. After moving back to school in Fall 2011, I in no way[,] shape or form, had any conversation about grazing horses, with any neighbor.

8. We also note that common knowledge of the true boundary lines is a fact from which multiple inferences may be drawn. It may weigh in favor of an adverse claim by showing the openness of a claimant's use or it may weigh in favor of finding a common understanding that a claimant's use was permissive. This again is a determination for the fact-finder and not one amenable to summary judgment.

2. I have never seen anyone jogging by our home.

3. I have only spoken to one neighbor in the White Tracts Association and those conversations were in passing at the University of Wyoming campus. That neighbor is not Mr. Selmer.

4. I did not have the conversation Mr. Selmer refers to in his affidavit.

[¶63] The second occasion on which the Wheelers claim the Whites requested permission to use the disputed property was described as follows in Tanya Wheeler's affidavit:

34. In mid-July 2015, Plaintiff Joslyn White came to our house to visit about the possibility of grazing horses in the area. Mrs. White had asked me whether it would be permissible for her and her husband to graze a few horses on the southerly portion of Tract 10. She indicated a desire to coordinate the grazing of her horses with us so as to minimize the possibility of our horses having contact with her horses at the Pasture Fence.

35. I told Mrs. White we would grant permission to use that part of Tract 10, and in fact we agreed to coordinate the grazing of our horses so that when Mrs. White had horses on her land and the southerly portion of Tract 10 that those horses would not be able to interact with our horses. We did this by keeping our horses in the corral by our house.

[¶64] In response to this evidence, the Whites submitted an affidavit by Joslyn White, whereby she denied requesting permission to use the disputed property. Ms. White attested:

34. I did **not** ask if it was permissible to graze the pasture. They had a mare in heat on their side of the fence. That made me uncomfortable about letting my horses in that pasture and getting nose to nose with the mare over the fence. I was going to graze the west pasture regardless and was trying to be neighborly and inform the Wheelers of it, and asked if they wanted to rotate the timing of the grazing to prevent problems between their horses and ours, for example, if I grazed south of the fence at night, and they grazed north of the fence during the day.

* * *

35. As to the claim that Mrs. Wheeler said the Wheelers "would grant permission," she did not state any such thing. I did not go to ask permission to graze my west pasture! I would certainly remember if she had said any such thing and I would have taken action immediately. As she and I agreed, after that conversation I would get my horses out of that pasture at daylight, or just breaking daylight, each day.

[¶65] As to both occasions on which the Whites allegedly requested permission to use the disputed property, the evidence is in clear dispute. Given that dispute, and the disputed facts concerning the nature of the 1988 fence, the district court erred in granting the Wheelers summary judgment on their claim that the Whites' use of the disputed property was permissive.

[¶66] Our decision in this case is not intended to be a prejudgment of either the Whites' or the Wheelers' claims or the evidence supporting their claims. We have observed that adverse possession cases, being fact sensitive in nature, are difficult candidates for summary judgment. *Braunstein*, ¶ 19, 226 P.3d at 835-36. On summary judgment, a trial court is constrained in the inferences it may draw from evidence and the weight it may assign to evidence. On the other hand, after a bench trial, the court as fact-finder is free to make credibility determinations, draw inferences, and assign weight to evidence in any manner supported by the record. *Graybill*, ¶ 25, 332 P.3d at 519. Our remand does not restrict the district court's leeway in that regard.

## CONCLUSION

[¶67] On cross-motions for summary judgment, a court is required to consider each motion independently, viewing the evidence on each motion in the light most favorable to the non-moving party. Viewed in this light, the evidence submitted in support of the cross-motions for summary judgment failed to establish that either party was entitled to summary judgment. The district court therefore did not err in denying the Whites' summary judgment motion, but did err in grant-

ing summary judgment to Wheelers. We therefore reverse the district court's entry of summary judgment and remand for proceedings consistent with this opinion.