# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 82

**APRIL TERM, A.D. 2022**

**June 27, 2022**

PATRICIA KAPPES, individually and
as Personal Representative of the Estate
of Lula M. Tanner,

Appellant
(Plaintiff),

v.                                                                          S-21-0238

DIANA RHODES and RHODES LAW
FIRM, LLC,

Appellees
(Defendants).

*Appeal from the District Court of Laramie County*
The Honorable Thomas T.C. Campbell, Judge

*Representing Appellant:*
William R. Fix, Fix Law Office, Kealakekua, Hawaii.

*Representing Appellees:*
Anna Reeves Olson, Park Street Law Office, Casper, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

---

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    Patricia Kappes filed a legal malpractice lawsuit against Diana Rhodes[1] after Ms. Rhodes failed to timely file an application with the Wyoming Medical Review Panel and a wrongful death lawsuit pertaining to the death of Ms. Kappes' mother.  Ms. Rhodes counterclaimed for breach of contract, alleging she and Ms. Kappes had entered into a valid and enforceable agreement to settle the legal malpractice claim for $100,000 which Ms. Kappes breached by filing suit.  The district court granted summary judgment in favor of Ms. Rhodes on her counterclaim.  Because there is a genuine issue of material fact as to whether the parties entered into a lawfully enforceable settlement agreement, we reverse and remand.

## ISSUE

[¶2]    The dispositive issue is:

Did the district court err by granting summary judgment to Ms. Rhodes on her counterclaim for breach of contract?

## FACTS

[¶3]    In July 2014, Lula M. Tanner was living with her daughter, Ms. Kappes, in Rock Springs.  Ms. Tanner was 90-years old and suffered from numerous health issues, including Type II diabetes, gout, congestive heart failure, and osteoarthritis.  Ms. Tanner fell twice and was admitted to the hospital.  Following her discharge from the hospital, she was transferred to Deseret Health and Rehab at Rock Springs, LLC (Deseret) for rehabilitation.  Upon completion of rehabilitation, she became a resident of Deseret.

[¶4]    In mid-January 2015, Dr. Jean Stachon, Ms. Tanner's primary care physician, changed Ms. Tanner's pain medication from Oxycontin to MSContin (a/k/a morphine) because Medicare would no longer cover the cost of Oxycontin.  On January 30, 2015, Ms. Tanner took her first dose of MSContin.  About a week later, on February 5, 2015, Ms. Kappes visited Ms. Tanner at Deseret.  Ms. Tanner was very weak, disoriented, and hypotensive (low blood pressure).  Ms. Kappes called Dr. Stachon, and they decided Ms. Tanner needed to go to the hospital.

[¶5]    When the paramedics arrived to take Ms. Tanner to the hospital, a Deseret nurse informed them Ms. Tanner's pain medication had been recently changed and her level of consciousness and blood pressure had steadily declined over the past week.  While en route to the hospital, the paramedics gave Ms. Tanner Naloxone (Narcan), a medication used to

---

[1] Ms. Kappes also sued Ms. Rhodes' law firm, the Rhodes Law Firm, LLC.  For ease of reference, we will refer only to Ms. Rhodes.

treat opioid overdoses. Ms. Tanner immediately complained of "intense pain all over her body." About an hour and half later, while in the emergency department, Ms. Tanner died. The cause of death was listed as "[c]ardiac arrest secondary to arrhythmia and unknown cause" and "[n]arcotic withdrawal."

[¶6]    In January 2016, Ms. Kappes contacted Ms. Rhodes seeking a legal opinion as to whether she had any recourse against Deseret or any of her mother's healthcare providers for her mother's death. Ms. Rhodes agreed to "investigate" the matter, and Ms. Kappes sent Ms. Rhodes her mother's medical records. On February 9, 2017, Ms. Kappes called Ms. Rhodes for an update; Ms. Rhodes informed her she was "two-thirds finished with the review." Ms. Kappes noted her concern with the statute of limitations, which she believed was three years. Ms. Rhodes stated the statute of limitations was two years but told Ms. Kappes they had "plenty of time" because Ms. Tanner died on February 15, 2015. Ms. Kappes corrected her, saying Ms. Tanner died on February 5, 2015. Ms. Rhodes said she would call Ms. Kappes back.

[¶7]    Ms. Rhodes discovered she had mis-calendared the statute of limitations as February 15, 2017, rather than February 5, 2017. She contacted ALPS Property & Casualty Company (ALPS), her legal malpractice carrier, and spoke with Christopher Fagan, a claims adjuster and licensed attorney, about a potential legal malpractice claim against her for mishandling Ms. Kappes' claim. According to Ms. Rhodes, Mr. Fagan told her to send him her file and to tell Ms. Kappes ALPS would be contacting her. Thereafter, Ms. Rhodes held a telephone conference with Ms. Kappes and Dr. Bonnie Randolph, Ms. Kappes' niece and Ms. Tanner's granddaughter, and informed them her legal malpractice carrier would be contacting them. Ms. Kappes "figured it out right then and there [Ms. Rhodes committed] malpractice when she missed the deadline." After she did not hear from the insurance carrier for over a week, Ms. Kappes called Ms. Rhodes' office and obtained Mr. Fagan's contact information.

[¶8]    In early March 2017, Ms. Kappes called Mr. Fagan about the legal malpractice claim. Mr. Fagan told her he had not had the opportunity to review the entire file but offered her $25,000 to settle the matter. He advised her to discuss the value of the case with her family and to talk to an attorney. Ms. Kappes decided not to contact an attorney but did talk to her three adult children, who "didn't have any idea what to ask for." Ms. Kappes "just c[a]me up with a figure within [her]self . . . [t]hinking it would all be coming to [her], whatever [she] asked for." On May 1, 2017, she called Mr. Fagan and told him she believed the case was worth $100,000. Mr. Fagan informed Ms. Kappes he believed $100,000 was reasonable. He told her he would confirm the amount with other attorneys at ALPS and send her release forms for "all [her] relatives." He also reminded her she could contact an attorney.

[¶9]     A few days later, Mr. Fagan called Ms. Kappes and told her he was "trying to push [the $100,000] through" and he believed it was "doable." On May 9, 2017, Mr. Fagan e-mailed Ms. Kappes the following:

> I apologize for the slight delay in getting back in touch. This correspondence follows our previous phone conversations. As you know, we have settled this matter in principle. ALPS has accepted your offer to settle this claim for payment in the amount of $100K in exchange for a full and final release from all potential claimants of all claims against attorney, Diana Rhodes, and her firm Rhodes Law Firm, L.L.C. Diana Rhodes consents to such a settlement. The settlement is currently contingent on reaching agreeable written release terms. As we discussed on the phone, I need some information from you in order to draft a proper release that will include all potential claimants that would have had some potential entitlement to proceeds from the wrongful death lawsuit you were seeking to file.
>
> As we discussed on the phone, it is my understanding that in this wrongful death action, Wyoming law will operate to limit the individuals who may receive disbursements from the settlement proceeds to Ms. Tanner's living children, Ms. Tanner's grandchildren from her deceased children, Ms. Tanner's brothers, sisters, parents, and grandparents. Based on the info you have provided, it is my understanding that the only individuals that might have some interest in the settlement proceeds would be you and the three children of your deceased sister—Bonnie Randolph, Burleigh Dean Binning, and Billie Jean Eckhart. Please let me know if there are others. I am working right now to confirm that the law in Wyoming is correctly stated above.
>
> We also discussed the need to confirm that no Medicare liens might encumber these settlement proceeds. In order to confirm that information, I will need the name of Ms. Tanner's husband and their social security numbers. Also, please complete the attached forms and return to me so I can have our compliance officer research the status of Medicare applicability to this case.
>
> I look forward to hearing from you. Feel free to call me anytime if you have any questions.

3

Attached to the email were two forms for Ms. Kappes to complete so ALPS could determine whether any Medicare liens existed.

[¶10]   About a week later, Mr. Fagan called Ms. Kappes because he had yet to receive the completed Medicare forms. Ms. Kappes stated she could not open the forms to print them, so Mr. Fagan re-sent them that day in a different format. Although Ms. Kappes informed Mr. Fagan she could now open the forms, Ms. Kappes never completed them. Instead, she retained counsel and filed a petition to be appointed her mother's wrongful death representative under Wyo. Stat. Ann. § 1-38-102 (LexisNexis 2021), which the district court granted.[2]

[¶11]   On July 15, 2019, Ms. Kappes[3] filed a legal malpractice complaint against Ms. Rhodes. Ms. Rhodes filed an answer and a counterclaim for breach of contract, alleging the parties had entered into a valid and enforceable agreement to settle the legal malpractice claim for $100,000 and Ms. Kappes breached the agreement by filing suit. Ms. Rhodes eventually filed a motion for summary judgment on her counterclaim. Ms. Kappes opposed the motion, arguing there were genuine issues of material fact with respect to whether the parties entered into a binding and enforceable settlement agreement. Specifically, she claimed the evidence showed she did not agree to settle, she thought the settlement proceeds being discussed were for her alone, the parties never discussed confidentiality of the settlement, and there was no agreement as to whether there were Medicare liens. Ms. Kappes further claimed any agreement was unconscionable due to the unequal bargaining power between her and ALPS.

[¶12]   After holding a hearing, the district court granted summary judgment in favor of Ms. Rhodes. It determined Ms. Kappes communicated to ALPS that the malpractice claim was worth $100,000; ALPS accepted Ms. Kappes' offer in the May 9, 2017, email; and Ms. Kappes never revoked her offer prior to ALPS's acceptance of it. The court concluded that at the moment ALPS accepted Ms. Kappes' offer a compromise had been struck: "Ms. Kappes would receive $100,000.00 and ALPS secured the release of all potential claims against Diana Rhodes." It rejected Ms. Kappes' argument that any settlement was contingent on the drafting and signing of a written release, an agreement regarding the confidentiality of the settlement, or the completion of the Medicare forms. While the court acknowledged "the settlement agreement between ALPS and Ms. Kappes could never be *completed* without the drafting and signing of releases, waivers[,] and the Medicare [forms]," it determined these formalities were not essential terms to the settlement.

---

[2] Ms. Kappes did not directly claim that she had no authority to settle the legal malpractice claim before she was appointed wrongful death representative. Accordingly, we will not discuss this issue.

[3] Ms. Kappes brought her complaint "individually and as personal representative of the Estate of Lula M. Tanner." However, the record shows Ms. Kappes had not been appointed as personal representative for purposes of bringing a wrongful death action when she dealt with Ms. Rhodes or ALPS.

4

According to the court, the only essential terms were the value of the claim in exchange for a release from liability.

[¶13] The court also rejected Ms. Kappes' claim the settlement agreement was unconscionable as a result of the unequal bargaining power between her and ALPS. It found Ms. Kappes was advised to seek the assistance of counsel but she chose not to do so. It also found no evidence that Mr. Fagan used his position as an attorney representing an insurer to pressure her into assenting to the terms of a contract. Indeed, Ms. Kappes came up with the $100,000 amount, which was four times what Mr. Fagan originally offered. It was only after Ms. Kappes realized she had to share the proceeds with the other beneficiaries of Ms. Tanner's estate that she deemed the amount to be unfair. Ms. Kappes timely appealed.

## DISCUSSION

[¶14] Wyoming Rule of Civil Procedure 56(a) requires a district court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

> We review a district court's order granting summary judgment *de novo* and afford no deference to the district court's ruling. *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016). This Court reviews the same materials and uses the same legal standard as the district court. *Id.* The record is assessed from the vantage point most favorable to the party opposing the motion . . ., and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.*

*White v. Wheeler*, 2017 WY 146, ¶ 14, 406 P.3d 1241, 1246 (Wyo. 2017) (quoting *The Tavern, LLC v. Town of Alpine*, 2017 WY 56, ¶ 46, 395 P.3d 167, 178-79 (Wyo. 2017)).

[¶15] "The party requesting a summary judgment bears the initial burden of establishing a prima facie case for summary judgment." *Gowdy v. Cook*, 2020 WY 3, ¶ 22, 455 P.3d 1201, 1207 (Wyo. 2020) (quoting *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 9, 148 P.3d 8, 12 (Wyo. 2006)). "Once the movant establishes a prima facie case for summary judgment, the burden shifts to the opposing party to present materials demonstrating a genuine dispute as to a material fact for trial." *Id.*, ¶ 23, 455 P.3d at 1207 (citing *Hatton*, ¶ 9, 148 P.3d at 12-13). "'The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment[.]'" *Id.* (quoting *Jones v. Schabron*,

5

2005 WY 65, ¶ 10, 113 P.3d 34, 37 (Wyo. 2005)) (other quotation marks and citation omitted).

[¶16]   Ms. Kappes argues the district court erred in granting summary judgment to Ms. Rhodes on her breach of contract counterclaim because there are genuine issues of material fact as to the existence of a valid and enforceable settlement agreement. Specifically, she argues there is evidence showing she did not agree to settle, she believed the settlement proceeds being discussed were for her alone, the parties never discussed confidentiality, and there was no agreement as to whether there were Medicare liens. She also points to Mr. Fagan's May 9 email, which specifically stated: "The settlement is currently *contingent* on reaching agreeable written release terms." (Emphasis added).[4]

[¶17]   To establish a prima facie case for breach of contract, a plaintiff must show: (1) "a lawfully enforceable contract," (2) "an unjustified failure to timely perform all or any part of what is promised therein," and (3) "entitlement of [the] injured party to damages." *Halling v. Yovanovich*, 2017 WY 28, ¶ 13, 391 P.3d 611, 616-17 (Wyo. 2017) (citation and quotation marks omitted). With respect to the first element, "[w]hether a contract has been entered into depends on the intent of the parties and is a question of fact." *Hunter v. Reece*, 2011 WY 97, ¶ 13, 253 P.3d 497, 500 (Wyo. 2011) (quoting *Wyo. Sawmills, Inc. v. Morris*, 756 P.2d 774, 775 (Wyo. 1988)). If the evidence is conflicting with respect to the existence of a contract, "the question should be put to the trier of the facts . . . , and it is not the province of the court to determine[.]" *Roussalis v. Wyo. Med. Ctr., Inc.*, 4 P.3d 209, 232 (Wyo. 2000).

[¶18]   "A settlement agreement is a contract, and it is subject to the same legal principles as those which apply to any contract." *Matter of Est. of McCormick*, 926 P.2d 360, 362 (Wyo. 1996) (citing *Idaho Migrant Council, Inc. v. Warila*, 890 P.2d 39, 41 (Wyo. 1995), and *Wyo. Bd. of Certified Pub. Accts. v. Christensen*, 800 P.2d 853, 856 (Wyo. 1990)).

> Our case law identifies the requisites of a contract. "An offer, acceptance, and consideration are the basic elements of a contract." *Bouwens v. Centrilift*, 974 P.2d 941, 946 (Wyo. 1999) (quoting *Miller v. Miller*, 664 P.2d 39, 40 (Wyo. 1983)). There must be mutual assent to the same terms. *Bouwens*, 974 P.2d at 946. The contracting process is usually straightforward. One party makes a manifestation of assent, called an offer, to

---

[4]   Ms. Kappes also argues the district court erred in denying her motion for partial summary judgment on Ms. Rhodes' counterclaim. However, Ms. Kappes failed to designate her summary judgment motion or any supporting evidence as part of the record on appeal (she made no designation at all). Accordingly, we cannot review whether the district court appropriately denied Ms. Kappes' Rule 56 motion related to the Rhodes counterclaim.

6

another; the latter then makes a manifestation of assent, called an acceptance, to the former. *Id.*

*Roussalis*, 4 P.3d at 249-50. *See also, Gould v. Ochsner*, 2015 WY 101, ¶ 54, 354 P.3d 965, 980 (Wyo. 2015) ("[A]n unconditional, timely acceptance of an offer, properly communicated to the offeror, constitutes a meeting of the minds and establishes an enforceable settlement agreement." (quoting *Wyo. Sawmills*, 756 P.2d at 775)); *Dobson v. Portrait Homes, Inc.*, 2005 WY 95, ¶ 9, 117 P.3d 1200, 1204 (Wyo. 2005) ("The elements [of a settlement agreement] are the same as the elements of any contract: offer, acceptance, and consideration, and establishment of the existence of these elements leads courts to conclude that mutual assent has occurred." (citing *McCormick*, 926 P.2d at 362)); and Restatement (Second) of Contracts § 22(1) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.").

[¶19]   Viewing the facts in the light most favorable to Ms. Kappes, we conclude a genuine issue of material fact exists regarding whether the parties entered into a lawfully enforceable settlement agreement.

[¶20]   Ms. Kappes testified that after Mr. Fagan offered to settle the matter for $25,000, she talked with her three children, who "didn't have any idea what to ask for," so she "just c[a]me up with a figure within [her]self. . . *thinking it would all be coming to [her], whatever [she] asked for*." (Emphasis added).   Once she came up with the $100,000, she called Mr. Fagan back.   Ms. Kappes testified as follows:

> Q  And you say [to Mr. Fagan] I'll settle for a hundred thousand dollars?
> A  *He never . . . told me that all these other people would be coming in on it*, so I was confused on that one.

(Emphasis added).   After Mr. Fagan told her he would have to talk to the other attorneys at ALPS, Ms. Kappes testified he "said something about sending me some release forms for . . . all my relatives. *And that was confusing to me, because we hadn't talked about it, that anybody else was being involved*."   (Emphasis added).   When Ms. Kappes was asked at her deposition why she did not believe there was a settlement agreement, she testified she "didn't get paperwork or anything from [Mr. Fagan]" and she "didn't feel like that was enough money."   She explained:

> Q.     Okay.   After you already gave the hundred-thousand-dollar idea, you wanted more?
> A.     Yes.
> . . . .

7

Q. . . . All right. So any other reasons why you didn't think it was a settlement because you wanted more and he didn't send paperwork? Anything else?

. . . .

A. *Well, I didn't know that I was going to be sharing with all the relatives.*

Q. Okay. When did you learn you'd be sharing with the relatives?

A. With this letter right here [referring to Mr. Fagan's May 9, 2017, email].

(Emphasis added).

[¶21] Mr. Fagan testified that his understanding while talking with Ms. Kappes was that she was the personal representative of her mother's estate, she had the authority to settle for the estate, and he was negotiating with Ms. Kappes on behalf of the estate. However, he admitted he did not know whether or not a probate estate had been set up and he never asked. He also did not know whether an estate would have to be established to accomplish the settlement. He further conceded he did not speak to any of Ms. Tanner's descendants other than Ms. Kappes. His testimony that the settlement was to release all of Ms. Tanner's heirs, not just Ms. Kappes, is confirmed by his May 9 email and his affidavit and notes. In the May 9 email, he stated: "I need some information from you in order to draft a *proper release that will include all potential claimants that would have had some potential entitlement to proceeds from the wrongful death lawsuit you were seeking to file.*" (Emphasis added). According to his affidavit and notes, after Ms. Kappes offered to settle the matter for $100,000, she asked him "about who would be entitled to [the] settlement proceeds." Mr. Fagan advised her he "would make the settlement check out to Ms. Kappes as personal representative of the Tanner Estate."

[¶22] Mr. Fagan believed Ms. Kappes was settling the legal malpractice claim against Ms. Rhodes on behalf of Ms. Tanner's estate and her heirs would be entitled to the settlement proceeds. Ms. Kappes, on the other hand, believed she was settling the claim for herself and she alone would be entitled to the proceeds. In other words, there is conflicting evidence as to the terms of Ms. Kappes' offer and whether Mr. Fagan accepted that offer or counter-offered with different terms. There is a genuine issue of material fact about whether the parties had a meeting of the minds on the fundamental issue of who was settling and who would be bound by the settlement. The district court erred in granting summary judgment in favor of Ms. Rhodes on her counterclaim.

**CONCLUSION**

8

[¶23]   Because there is a genuine issue of material fact with respect to whether the parties entered into a legally enforceable settlement agreement, the district court erred in granting summary judgment to Ms. Rhodes on her breach of contract counterclaim.

[¶24]   **REVERSED** and **REMANDED**.